[No. D034890. Fourth Dist., Div. One. Dec. 13, 2000.]

DENNIS E. DAMON, Plaintiff and Appellant, v.
OCEAN HILLS JOURNALISM CLUB et al., Defendants and
Respondents.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to *California Rules of Court*, rule 976.1, this opinion is certified for publication with the exception of Discussion section, parts II and III.

470

---

**COUNSEL**

Laturno & Graves, David W. Graves and G. Ehrich Lenz for Plaintiff and Appellant.

Bragg, Short, Serota & Kuluva, William P. Harris III, Lori D. Serota and Henry Nicholls for Defendants and Respondents Ron Terry and Barney Feldman.

Gray Cary Ware & Freidenrich, Guylyn R. Cummins, Marcelle E. Mihaila and Joann F. Peters for Defendants and Respondents Ocean Hills Journalism

Club, Estate of Jack Hess, Rosmarie Treher, Sherry Marsh, Art Rosenberg, Estate of James J. Nihan, and Joe Grant.

## OPINION

**HALLER, J.**—Dennis E. Damon, a former manager of a homeowners association, brought a defamation complaint against several of the association members, two board of directors members, and a private homeowners association club.[2] The trial court granted defendants' motion to strike the complaint under California's anti-SLAPP (strategic lawsuit against public participation) statute. (Code Civ. Proc., § 425.16.) Damon appeals.

In the published portion of this decision, we hold the trial court properly determined the anti-SLAPP statute applied because the evidence showed the alleged defamatory statements were made "in a place open to the public or in a public forum" and concerned "an issue of public interest" within the meaning of Code of Civil Procedure section 425.16, subdivision (e)(3). In the unpublished portion of the opinion, we conclude Damon failed to satisfy his burden to show a probability he would prevail on his claims at trial, and failed to show the trial court erred in refusing to grant him relief from the statutory discovery stay.

## FACTS

Leisure Village at Ocean Hills is a planned development residential community for seniors, consisting of 1,633 homes, a golf course and many other recreational facilities. The residents are members of the Ocean Hills Country Club Homeowners Association (Association), which is governed by a seven-member elected board of directors (Board). The Board's duties include managing all aspects of the Association, including security, maintenance, and the selection and removal of officers and employees. The Association's annual budget generally exceeds $3 million.

In 1994 through 1996, a professional company managed the Association under the Board's direction. In February 1996, the Board terminated these services and chose to become self-managed. The Board hired Damon, a retired United States Marine Corps officer, as its general manager. Damon had previously served as the Association's general manager under the

---

[2]The named defendant homeowners association members were Jack Hess, Rosemarie Treher, Sherry Marsh, Art Rosenberg, James J. Nihan, and Joe Grant. Nihan and Hess have since died, and their estates have been substituted. The defendant board members were Ron Terry and Barney Feldman. The private club is the Ocean Hills Journalism Club.

direction of various professional management companies. Thereafter, Damon managed the Association's day-to-day operations under the Board's direction and supervised the approximately 60 Association employees.

By late 1996, many homeowners were displeased with Damon's management style and wanted to return to professional management. The homeowners were concerned about Damon's handling of numerous aspects of the Association, including the security department, employee relations, maintenance activities, and contractor selection. These homeowners began to express their views in articles, editorials, and letters to the editor in the Village Voice newsletter, which was published by a private homeowners club (Journalism Club) and was circulated to Association members and local businesses. The homeowners criticized Damon's competency to manage the Association and urged residents to replace Damon with a professional management company. The Village Voice was one of two newsletters for Ocean Hills residents; the other newsletter was the Board's official publication.

In March 1997, several Journalism Club members met with the Association's security department employees (many of whom were also Ocean Hills residents), who complained about Damon's management policies. When Damon learned of the meeting, he reminded the employees they were required to follow grievance procedures outlined in the personnel manual, rather than directing their complaints to Association members.

The 1996/1997 Board supported Damon's continued service. But in August 1997, the Association held the annual Board member elections, and the residents elected several new directors who wanted to return to professional management, including respondents Terry and Feldman. Terry and Feldman thereafter made comments during Board meetings that were critical of Damon's performance as general manager, and questioned Damon's competency and veracity. Additionally, Terry, who was the Board member responsible for overseeing the security department, authored memoranda discussing problems with Damon's management of that department and criticizing Damon's overall performance.

By the end of 1997, the senior citizen residents of Ocean Hills were largely split into two camps: those who favored Damon's continued service and those who wanted Damon terminated as general manager. One homeowner characterized the highly emotional atmosphere surrounding this dispute as a "war zone with verbal salvo[s] being lobbed back and forth," reflecting feelings of "hate and discontent" among the homeowners. Most residents were aware that the Village Voice publisher fell into the camp supporting Damon's termination.

About this same time, Damon wrote an article in the official Association newsletter discussing the advantages and disadvantages of self-management, and urging the residents to maintain their self-managed governance status. The article was contained in Damon's regular monthly column that appeared in this newsletter.

In early 1998, some homeowners who supported Damon initiated a recall election to remove Terry and Feldman. The recall effort was unsuccessful; a majority of the homeowners supported Terry and Feldman. Damon thereafter notified the Association he did not intend to renew his contract. The Board declined his offer to continue his employment on a monthly basis until a replacement could be found. The homeowners later voted to return to professional management.

Damon then filed a defamation complaint against (1) the six Association members who had authored letters or articles published in the Village Voice criticizing Damon's performance; (2) Board members Feldman and Terry; and (3) the Village Voice publisher (the Journalism Club).

Defendants successfully moved to strike Damon's complaint under the anti-SLAPP statute, Code of Civil Procedure section 425.16 (section 425.16). The trial court found (1) Damon's complaint was subject to the anti-SLAPP statute because it arose from defendants' exercise of their free speech rights in connection with a public issue; and (2) Damon failed to show it was probable he would prevail on his claims because (a) he was a "limited-purpose" public figure who failed to demonstrate actual malice; and (b) the alleged defamatory statements were privileged and/or nonactionable opinions. Damon appeals.

## DISCUSSION

In 1992, the Legislature enacted section 425.16 to provide a procedure for a court "to dismiss at an early stage nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue. [Citation.]" (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 235 [83 Cal.Rptr.2d 677].) This type of nonmeritorious litigation is referred to under the acronym SLAPP, or strategic lawsuit against public participation. (*Ibid.*) In 1997, the Legislature added a provision to section 425.16 mandating that courts "broadly" construe the anti-SLAPP statute to further the legislative goals of encouraging participation in matters of public significance and discouraging abuse of the judicial process. (§ 425.16, subd. (a).)

When a plaintiff brings a SLAPP suit, the defendant may immediately move to strike the complaint under section 425.16. To prevail on this

motion, the defendant must "make an initial prima facie showing that plaintiff's suit arises from an act in furtherance of defendant's right of petition or free speech." (*Braun v. Chronicle Publishing Co.* (1998) 52 Cal.App.4th 1036, 1042-1043 [61 Cal.Rptr.2d 58].) If this burden is met, the plaintiff must establish a reasonable probability he or she will prevail on the merits. (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 824-825 [33 Cal.Rptr.2d 446].) In determining whether each party has met its burden, the trial court must "consider the pleadings, and supporting and opposing affidavits . . . ." (§ 425.16, subd. (b)(2).) These determinations are legal questions, and we review the record de novo. (*Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 548 [46 Cal.Rptr.2d 880].)

Under these standards, we examine the record to determine whether the court properly granted defendants' motion to strike under section 425.16.

### I. *Damon's Defamation Claims Come Within the Anti-SLAPP Statute*

Section 425.16, subdivision (b)(1) states that the statute applies when the cause of action arises from *"any act . . . in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue . . . ."* (Italics added.) Section 425.16, subdivision (e) defines this italicized phrase as including four categories. The first two categories pertain to statements or writings made before, or in connection with, a "legislative, executive or judicial body, or any other official proceeding . . . ." (§ 425.16, subd. (e)(1), (2).) The third category involves statements or writings made "in a place open to the public or in a public forum." (§ 425.16, subd. (e)(3).) The fourth category includes "any other conduct in furtherance of" free speech or petition rights. (§ 425.16, subd. (e)(4).) The latter two categories require a specific showing the action concerns a matter of public interest; the first two categories do not require this showing. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117-1118 [81 Cal.Rptr.2d 471, 969 P.2d 564].)

 As explained below, we conclude the alleged defamatory statements identified in Damon's complaint fall within the third statutory category: "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest . . . ."[3] (§ 425.16, subd. (e)(3).) The two locations where the alleged defamatory statements were made—at the Board meetings and in the Village Voice newsletter—were open to the public and constituted "public forums." Additionally, because each of the allegedly defamatory statements concerned

---

[3]This conclusion renders it unnecessary for us to consider the issue of whether the alleged defamatory statements come under section 425.16, subdivision (e)(1) or (2).

the manner in which a large residential community would be governed, they concerned "issue[s] of public interest." (§ 425.16, subd. (e)(3).)

## A. *Public Forum*

■ A "public forum" is traditionally defined as a place that is open to the public where information is freely exchanged. (See *Clark v. Burleigh* (1992) 4 Cal.4th 474, 482 [14 Cal.Rptr.2d 455, 841 P.2d 975].) ■ The Board meetings fit into this definition. The Board meetings were televised and open to all interested parties, and the meetings served as a place where members could communicate their ideas. Further, the Board meetings served a function similar to that of a governmental body. ■ As our Supreme Court has recognized, owners of planned development units " 'comprise a little democratic subsociety . . . .' " (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 374 [33 Cal.Rptr.2d 63, 878 P.2d 1275]; see *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 651 [191 Cal.Rptr. 209].) In exchange for the benefits of common ownership, the residents elect an legislative/executive board and delegate powers to this board. This delegation concerns not only activities conducted in the common areas, but also extends to life within " 'the confines of the home itself.' " (*Nahrstedt v. Lakeside Village Condominium Assn., supra,* 8 Cal.4th at p. 373) A homeowners association board is in effect "a quasi-government entity paralleling in almost every case the powers, duties, and responsibilities of a municipal government." (*Cohen v. Kite Hill Community Assn., supra,* 142 Cal.App.3d at p. 651.)

■ Because of a homeowners association board's broad powers and the number of individuals potentially affected by a board's actions, the Legislature has mandated that boards hold open meetings and allow the members to speak publicly at the meetings. (Civ. Code, §§ 1363.05, 1363, 1350-1376.) These provisions parallel California's open meeting laws regulating government officials, agencies and boards. (Ralph M. Brown Act, Gov. Code, § 54950 et seq.) Both statutory schemes mandate open governance meetings, with notice, agenda and minutes requirements, and strictly limit closed executive sessions. (See, e.g., Civ. Code, § 1363.05, subd. (b).)

The Board here played a critical role in making and enforcing rules affecting the daily lives of Ocean Hills residents. Those rules were promulgated at Board meetings, which were televised, open to all Association members, and served as a place for open discussion among directors and members. Approximately 3,000 residents were affected by the policies adopted at Board meetings. On this record, the Board meetings were "public forums." (See *Foothills Townhome Assn. v. Christiansen* (1998) 65 Cal.App.4th 688, 695-696 [76 Cal.Rptr.2d 516].)

The Village Voice newsletter was also a "public forum" within the meaning of section 425.16, subdivision (e)(3). Under its plain meaning, a public forum is not limited to a physical setting, but also includes other forms of public communication. (See American Heritage Dict. (New College ed. 1981) p. 518.) The stated purpose of the Village Voice newsletter was to "communicate information of interest and/or concern to the residents." The newsletter was distributed to the approximately 3,000 Ocean Hills residents and neighboring businesses. Further, although most of the articles and letters were critical of Damon's management, the Village Voice publisher also solicited contrary opinions, printed at least two letters with different viewpoints, and included articles on many other Association-related topics (such as a series on proposed CC&R amendments).

Damon argues the Village Voice newsletter cannot be considered a "public forum" because it was essentially a mouthpiece for a small group of homeowners who generally would not permit contrary viewpoints to be published in the newsletter.

Even assuming the record supports this characterization, these facts do not take the publication outside of the anti-SLAPP statutory protection. First, numerous courts have broadly construed section 425.16, subdivision (e)(3)'s "public forum" requirement to include publications with a single viewpoint. (See *Macias v. Hartwell* (1997) 55 Cal.App.4th 669, 674 [64 Cal.Rptr.2d 222] [union campaign flyer is a "recognized public forum under the SLAPP statute"]; see also *Metabolife Internat., Inc. v. Wornick* (S.D.Cal. 1999) 72 F.Supp.2d 1160, 1165 ["a widely disseminated television broadcast . . . is undoubtedly a public forum"]; *Sipple v. Foundation for Nat. Progress, supra,* 71 Cal.App.4th at p. 238 [assuming that Mother Jones magazine is a public forum within the meaning of the anti-SLAPP statute]; *Foothills Townhome Assn. v. Christiansen, supra,* 65 Cal.App.4th at pp. 695-696; Tate, *California's Anti-SLAPP Legislation: A Summary of and Commentary on its Operation and Scope* (2000) 33 Loyola L.A. L.Rev. 801, 828-832; see also *Averill v. Superior Court* (1996) 42 Cal.App.4th 1170 [50 Cal.Rptr.2d 62].)

We agree with this approach. The Village Voice was a public forum in the sense that it was a vehicle for communicating a message about public matters to a large and interested community. All interested parties had full opportunity to read the articles in the newsletter. Although the Village Voice newsletter may not have offered a "balanced" view, the Association's other newsletter—the Board's official newsletter—was the place where Association members with differing viewpoints could express their opposing views. It is in this marketplace of ideas that the Village Voice served a very public communicative purpose promoting open discussion—a purpose analogous to

a public forum. Given the mandate that we broadly construe the anti-SLAPP statute, a single publication does not lose its "public forum" character merely because it does not provide a balanced point of view.

This construction comports with the fundamental purpose underlying the anti-SLAPP statute, which seeks to protect against "lawsuits brought primarily to chill the valid exercise of constitutional rights" and "abuse of the judicial process . . . ." (§ 425.16, subd. (a).) This purpose would not be served if we were to construe the statute to make section 425.16, subdivision (e)(3) inapplicable to all newspapers, magazines, and other public media merely because the publication is arguably "one-sided." This is particularly true because section 425.16, subdivision (e)(3) requires not only that the statement be made in a public forum, but also that it concern an issue of public interest. Further, because section 425.16, subdivision (e)(4) includes *conduct* in furtherance of free speech rights, regardless whether that conduct occurs in a place where ideas are freely exchanged, it would be anomalous to interpret section 425.16, subdivision (e)(3) as imposing that requirement merely because the challenged speech is an oral or written statement.

We recognize that two courts have more narrowly construed section 425.16, subdivision (e)(3)'s "public forum" requirement, but we are not persuaded this is the correct approach. (See *Zhao v. Wong* (1996) 48 Cal.App.4th 1114 [55 Cal.Rptr.2d 909], overruled on other grounds in *Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1107 (*Zhao*); *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 863, fn. 5 [44 Cal.Rptr.2d 46] (*Lafayette Morehouse*).)

In *Lafayette Morehouse*, the plaintiff sued the publisher of the San Francisco Chronicle newspaper, alleging the newspaper printed defamatory articles. (*Lafayette Morehouse, supra,* 37 Cal.App.4th at p. 863.) The court found the challenged statements fell within section 425.16, subdivision (e)(2) because they concerned a matter that was pending before a legislative body. (37 Cal.App.4th at pp. 862-863.) The court thus declined to reach the defendant publisher's alternate argument that the newspaper constituted a "public forum" under section 425.16, subdivision (e)(3). (37 Cal.App.4th at p. 863, fn. 5.) In dicta, however, the court stated it found the publisher's argument "dubious" because "[n]ewspaper editors or publishers customarily retain the final authority on what their newspapers will publish in letters to the editor, editorial pages, and even news articles, resulting at best in a controlled forum not an uninhibited 'public forum.' " (*Ibid.*)

In *Zhao*, the plaintiff sued an individual for defamation based on the defendant's statements made privately to a San Jose Mercury newspaper

reporter. Not surprisingly, the court concluded that such "private" statements did not occur in a "public forum" within the meaning of section 425.16, subdivision (e)(3). (*Zhao, supra,* 48 Cal.App.4th at p. 1131.) Although further discussion on this matter was arguably unnecessary, the court went on to conclude that the San Jose Mercury newspaper (which published the statements) was also not a public forum. (*Ibid.*) Relying on *Lafayette Morehouse*'s dicta and expressly applying a "narrow definition" of the statutory phrase, the *Zhao* court reasoned that a public forum " 'refers typically to those places historically associated with First Amendment activities, such as streets, sidewalks, and parks,' " and has been extended only to other public facilities open for certain limited purposes such as libraries and schools. (*Id.* at pp. 1126-1127.) The court further relied on *Lafayette Morehouse*'s statements that a private newspaper cannot as a matter of law constitute a public forum because the publisher has ultimate control over the newspaper's message. (*Id.* at pp. 1126, 1131.) Noting that the phrase "public forum" potentially triggers a more "elastic" definition, the *Zhao* court expressly declined to adopt this definition and instead adhered to the more "restricted" approach. (*Id.* at pp. 1125, 1127.)

Both *Zhou* and *Lafayette Morehouse* predate the 1997 amendment requiring a broad interpretation of section 425.16. In adopting that amendment, the Legislature expressly intended to overrule *Zhao*'s narrow view of the statute. (See *Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1120.) Moreover, as at least one commentator has noted, the *Zhao* and *Lafayette Morehouse* courts' conclusions appear to be at odds with the definition of a "public forum" under the plain meaning of the phrase and under the California Constitution. (See Tate, *California's Anti-SLAPP Legislation: A Summary of and Commentary on its Operation and Scope, supra,* 33 Loyola L.A. L.Rev. at pp. 828-832.) Read in context of the entire statutory scheme, a "public forum" includes a communication vehicle that is widely distributed to the public and contains topics of public interest, regardless whether the message is "uninhibited" or "controlled."

Because the Village Voice newsletter was a vehicle for open discussion of public issues and was widely distributed to all interested parties, it was a "public forum."

### B. *Public Issue*

In addition to the "public forum" requirement, defendants were also required to show the topics of the allegedly defamatory statements concerned "issue[s] of public interest." (§ 425.16, subd. (e)(3).) The record shows defendants satisfied this element.

■ The definition of "public interest" within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity. (See *Macias v. Hartwell, supra,* 55 Cal.App.4th at p. 674; *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 650-651 [49 Cal.Rptr.2d 620].) " '[M]atters of public interest . . . include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals.' " (*Macias v. Hartwell, supra,* 55 Cal.App.4th at p. 674.) In *Macias,* the court found that campaign statements made during a union election constituted a "public" issue because the statements affected 10,000 union members and concerned a fundamental political matter—the qualifications of a candidate to run for office. (*Id.* at pp. 673-674.)

■ As detailed below, each of the alleged defamatory statements concerned (1) the decision whether to continue to be self-governed or to switch to a professional management company; and/or (2) Damon's competency to manage the Association. These statements pertained to issues of public interest within the Ocean Hills community. Indeed, they concerned the very manner in which this group of more than 3,000 individuals would be governed—an inherently political question of vital importance to each individual and to the community as a whole. (See *Chantiles v. Lake Forest II Master Homeowners Assn.* (1995) 37 Cal.App.4th 914, 922 [45 Cal.Rptr.2d 1].) Moreover, the statements were made in connection with the Board elections and recall campaigns. "The right to speak on political matters is the quintessential subject of our constitutional protections of the right of free speech. 'Public discussion about the qualifications of those who hold or who wish to hold positions of public trust presents the strongest possible case for applications of the safeguards afforded by the First Amendment.' " (*Matson v. Dvorak, supra,* 40 Cal.App.4th at p. 548; accord, *Conroy v. Spitzer* (1999) 70 Cal.App.4th 1446, 1451 [83 Cal.Rptr.2d 443] [the defendant's "statements obviously fell within the purview of section 425.16 because they addressed a matter of public concern—a candidate's qualifications and conduct in office"].)

Although the allegedly defamatory statements were made in connection with the management of a private homeowners association, they concerned issues of critical importance to a large segment of our local population. "For many Californians, the homeowners association functions as a second municipal government . . . ." (*Chantiles v. Lake Forest II Master Homeowners Assn., supra,* 37 Cal.App.4th at p. 922.) Given the size of the Ocean Hills community, the nature of the challenged statements as involving fundamental choices regarding future management and leadership of the Association,

and our Legislature's mandate that homeowner association boards be treated similar to governmental entities, the alleged defamatory comments involved "public issues" within the meaning of the anti-SLAPP statute. (§ 425.16, subd. (e)(3).)

We reject Damon's alternate argument the case does not fall within section 425.16 because the "primary purpose" of his lawsuit was to "vindicate the damage done to his reputation" and not to "interfere with and burden the defendant's exercise of his free speech rights . . . ." We find nothing in the statute requiring the court to engage in an inquiry as to the plaintiff's subjective motivations before it may determine the anti-SLAPP statute is applicable. (See *Church of Scientology v. Wollersham, supra,* 42 Cal.App.4th at p. 648 [rejecting plaintiff's argument that "only a direct personal attack on the defendant would be subject to a motion to strike"].) The fact the Legislature expressed a concern in the statute's preamble with lawsuits brought "primarily" to chill First Amendment rights does not mean that a court may add this concept as a separate requirement in the operative sections of the statute. (See *Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1118.)

Damon's reliance on *Foothills Townhome Assn. v. Christiansen, supra,* 65 Cal.App.4th 688 is misplaced. Damon directs us to the court's statement that "[w]hen considering a section 425.16 motion, a court must consider the actual objective of the suit and grant the motion if the true goal is to interfere with and burden the defendant's exercise of his free speech and petition rights." (*Id.* at p. 696.) This statement must be viewed in the specific factual context in which the case arose, involving a homeowners association's attempt to collect on an assessment from a homeowner. Because this form of action did not reflect an attempt to "chill" the homeowner's free speech, the *Foothills Townhome* court found the anti-SLAPP statute inapplicable. (*Ibid.*) Here, the defamation action certainly had the potential for punishing the defendants for exercising their First Amendment rights, thus serving to "chill" the exercise of their rights and to deter them from speaking freely on topics of public importance.

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . .

*See footnote 1, *ante,* page 468.

## Disposition

Judgment affirmed.

Kremer, P. J., and Huffman, J., concurred.