852 A.2d 202 (2004)
371 N.J. Super. 77
Joseph H. VERNA, and Wendy L. Verna, husband and wife, Plaintiffs-Appellants/Cross-Respondents,
v.
The LINKS AT VALLEYBROOK NEIGHBORHOOD ASSOCIATION, INC., Defendant-Respondent/Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 21, 2004.
Decided July 6, 2004.
*205 Dennis P. McInerney, Moorestown, argued the cause for appellants/cross-respondents.
David J. Byrne, Lawrenceville, argued the cause for respondent/cross-appellant (Stark and Stark, attorneys; Mr. Byrne, of counsel; Mr. Byrne and Kristen L. Seibold, on the brief).
Before Judges SKILLMAN, COBURN and C.S. FISHER. *203
*204 The opinion of the court was delivered by FISHER, J.A.D.
In this appeal, we are required to resolve the following matters of first impression in this State: (a) whether a homeowners association, having previously ceded jurisdiction of its streets to a municipality, retains the authority to enforce its own parking regulations, (b) whether such an association's board of directors exceeds its authority to conduct elections when it issues a "candidate audit" advising unit owners which of the candidates were members in "good standing," and (c) whether, when asserting a defamation claim, a candidate for election to an association's board of directors should be considered a "public figure." For the following reasons, we answer these questions in the affirmative.

I
Plaintiff Joseph Verna (plaintiff), and his wife, are owners of a townhouse in The Links At Valleybrook Neighborhood Association, Inc. (the association), a planned unit development located in Gloucester Township. The association was formed as a not-for-profit corporation pursuant to N.J.S.A. 15A:1-1 to 16-2.
By way of complaint,[1] and a later amended complaint, plaintiff asserted that (1) the association was actively attempting to enforce an invalid regulation concerning the parking of his vehicle on the association's streets and in his driveway, (2) the association's board of directors acted beyond its authority when it issued a "candidate audit" for a board election, (3) he was defamed by the candidate audit, and (4) he was wrongfully removed from the association's architectural advisory committee. The association filed a counterclaim, seeking (1) an injunction barring *206 plaintiff from parking his vehicle on association property, (2) the collection of plaintiff's allegedly outstanding parking fines, (3) compensatory and punitive damages for an alleged defamation, and (4) an award of attorneys' fees.
The parties engaged in extensive discovery and filed numerous substantive motions. As is relevant to this appeal, the trial judge granted the association's motion for partial summary judgment declaring the parking regulations enforceable, and a later motion for partial summary judgment dismissing plaintiff's defamation claims. At trial, the judge rejected, pursuant to R. 4:37-2(b), plaintiff's argument that the association should be estopped from attempting to prevent him from parking his vehicle on the association's streets. After the association presented its witnesses, the trial judge determined, as a matter of law, that the board had the inherent power to issue the candidate audit. After the trial was concluded, the judge entered orders which permanently enjoined plaintiff from parking his vehicle on association property and denied the association's request for an award of attorneys' fees.
Plaintiff appealed, raising the following arguments:
I. THE LOWER COURT'S DECISION THAT THE ASSOCIATION'S PARKING REGULATIONS APPLY TO THE PUBLIC ROADWAYS WITHIN THE [ASSOCIATION] SHOULD BE REVERSED.
II. THE ASSOCIATION'S PARKING RESTRICTIONS AS THEY APPLY TO BOTH ON-STREET AND OFF-STREET PARKING ARE UNENFORCEABLE.
III. THE RESTRICTIONS IN QUESTION ARE ALSO UNENFORCEABLE BECAUSE AS WRITTEN THE RESTRICTIONS FAIL TO MEET CERTAIN CONSTITUTIONAL STANDARDS.
IV. FINES IMPOSED BY THE ASSOCIATION ARE VOID AND UNCOLLECTIBLE BECAUSE THEY HAVE NO BASIS IN THE DECLARATION OF COVENANTS, EASEMENTS AND RESTRICTIONS.
V. THE RESTRICTIONS AS APPLIED IN THIS MATTER ARE UNENFORCEABLE DUE TO THE PRINCIPLE OF EQUITABLE ESTOPPEL.
VI. THE ASSOCIATION BREACHED ITS FIDUCIARY DUTY TO [PLAINTIFFS] WHEN IT ISSUED THE CANDIDATE AUDIT.
VII. THE TRIAL COURT'S DISMISSAL OF THE DEFAMATION CLAIMS CONTAINED IN COUNTS II AND [III] OF PLAINTIFFS' COMPLAINT SHOULD BE REVERSED.
VIII. DISMISSAL OF PLAINTIFFS' CLAIM FOR ATTORNEYS' FEES AS PART OF THEIR CLAIM FOR DAMAGES WAS UNSUPPORTED BY LEGAL AUTHORITY AND SHOULD BE REVERSED.
The association filed a cross-appeal, raising a single issue:
I. THE TRIAL COURT'S DENIAL OF THE ASSOCIATION'S APPLICATION FOR ATTORNEY FEES AND COSTS SHOULD BE REVERSED.
After careful review of the briefs and the record on appeal, we conclude that the arguments set forth by plaintiff in Points III, V, and VIII are clearly without merit and do not warrant discussion, R. 2:11-3(e)(1)(E), and that the argument in Point IV was rendered moot by the association's voluntary withdrawal of its claim for the collection of fines. For reasons more fully explained hereafter, we agree with the association that it is empowered to regulate the parking of vehicles on association property *207 but will vacate the permanent injunction entered in its favor. We reject the association's argument that it was entitled to issue the candidate audit; however, we also reject plaintiff's claim to a remedy for that unauthorized action. In addition, we agree with the trial judge's determination that plaintiff should be viewed as a limited purpose public figure by seeking election to the board of directors and, thus, affirm the dismissal of his defamation claim. We lastly affirm the denial of the association's claim for attorneys' fees and costs.

II
Plaintiff and his wife purchased a townhouse in the association in 1996. Their townhouse is situated on LaCosta Drive which, like the other roadways in the association, was dedicated to Gloucester Township.
Plaintiff is a self-employed electrician. For business purposes, at the times relevant to this action, plaintiff utilized a red Ford Econoline 150 Model van, the frequent appearance of which troubled the association and triggered this convoluted lawsuit. The association's governing documents state that "[n]o vehicles larger than a van and no commercial vehicle ... except those vehicles temporarily on the property for the purpose of servicing the Property itself or one of the Units, shall be permitted on or to be parked upon the Property without the prior written consent of the Board of Directors." The association claimed that this provision prohibited plaintiff from parking the van in his driveway.
After extended discussions and conflict, plaintiff stopped leaving the van in his driveway. Plaintiff, however, occasionally parked the van on LaCosta Drive in front of his townhouse. The association claimed this was also prohibited, relying upon the following provision in the association's architectural control guidelines:
No trailers or commercial vehicles shall be permitted to remain on any Lot or street in The Links without the written consent of the Board....
By the time the parking of the van on LaCosta Drive became controversial, Gloucester Township had adopted an ordinance accepting for dedication as public streets the roadways within the association, including LaCosta Drive.
Plaintiff claimed that Gloucester's acceptance of jurisdiction over the streets precluded the association from attempting to enforce its own parking regulations. The trial judge disagreed and granted the association's motion for partial summary judgment. Later, after trial, the judge permanently enjoined plaintiff from parking his van on LaCosta Drive or any other street in the association. On appeal, plaintiff argues that the van did not constitute a "commercial vehicle" within the meaning of the regulation in question and that the association did not have the authority to enforce its parking regulations, claiming that the only limitations on parking are those imposed by a Gloucester ordinance.[2]
Even though the association's regulations do not expressly define what constitutes a "commercial vehicle," we reject plaintiff's argument that his van does not fit that label. Not only does the van exhibit commercial license plates, which alone seems conclusive on the subject, it *208 also had, on its top, a roof rack holding several ladders and PVC tubing. On its side, the van had a sign identifying plaintiff's business, although this sign was merely affixed with magnets and could readily be removed. Clearly, the van's primary, if not exclusive, use and appearance suggested that it was related to plaintiff's business and, therefore, constituted a "commercial vehicle" within the common and ordinary meaning of those words. We hold that the trial judge accurately interpreted the association's regulation.
More importantly, plaintiff has questioned whether the association could continue to regulate parking on the association's streets once they were dedicated to public use. We are aware of no authorities, other than Maryland Estates Homeowners' Ass'n v. Puckett, 936 S.W.2d 218 (Mo.App.1996), to have considered the issue. Plaintiff argues that our decision in State v. Panther Valley Prop. Owners Ass'n, 307 N.J.Super. 319, 704 A.2d 1010 (App.Div.1998) demonstrates that only the municipality's parking regulations are enforceable. We conclude that the circumstances presented are materially dissimilar from those in Panther Valley and that the association may regulate parking, coextensively with Gloucester, even though the association's private roads became part of the overall network of public roadways.
Panther Valley considered the significance of an association's ceding of jurisdiction over its private roads to municipal and state law enforcement officials. After that transfer, the State commenced an action seeking to enjoin the association from enforcing its own rules and regulations upon community residents for speeding and careless or reckless driving. Since, in Panther Valley, we affirmed the trial judge's grant of summary judgment in favor of the State, rejecting the association's contention that it retained "coextensive powers to promulgate and enforce its own traffic regulations," id. at 322, 704 A.2d 1010, plaintiff argues that the association, by dedicating its private roads to public use, also lost any power to enforce its own parking regulations.
There is a significant distinction between an association's power to regulate traffic and its power to regulate parking. N.J.S.A. 46:8B-15(f) states that, if authorized by master deed or bylaws, an "association may impose reasonable fines upon unit owners for failure to comply" with its existing regulations, but "an association may not impose fines for moving automobile violations." Since N.J.S.A. 46:8B-15(f) applies here, its express declaration that moving violations may not be regulated by an association demonstrates there is no prohibition against an association regulating the streets in some other manner. This comports with the general rule of statutory construction that "enumerated exceptions in a statute indicate a legislative intent that the statute be applied to all cases not specifically excepted." State v. Reed, 34 N.J. 554, 558, 170 A.2d 419 (1961); see also Cyktor v. Aspen Manor Condo. Ass'n, 359 N.J.Super. 459, 472, 820 A.2d 129 (App.Div.2003); N.J. State Bd. of Optometrists v. S.S. Kresge Co., 113 N.J.L. 287, 295, 174 A. 353 (Sup.Ct.1934), mod., 115 N.J.L. 495, 181 A. 152 (E. & A.1935).
Even though N.J.S.A. 46:8B-15(f) was found inapplicable to the Panther Valley community, Panther Valley, supra, 307 N.J.Super. at 327, 704 A.2d 1010,[3] we nevertheless concluded that other reasons existed for prohibiting a community from *209 attempting to enforce its own traffic regulations, citing the need for uniform enforcement and the avoidance of the potential obstruction of lawful enforcement of the motor vehicle laws. 307 N.J.Super. at 330-32, 704 A.2d 1010. These important policies, while sufficient to preclude the coextensive exercise of power by both law enforcement and a homeowners association to regulate traffic, are not implicated when the authority to regulate parking is concerned. In essence, plaintiff argues, through a misinterpretation of Panther Valley, that the power of an association to regulate in those areas not expressly prohibited by N.J.S.A. 46:8B-15(f) begins and ends at the point where the State or municipality may regulate. We disagree. While Panther Valley rejected the notion that there could be coextensive regulation of traffic, it does not follow, and we reject the argument, that there may not be coextensive regulation of parking on these roads.
We view the association's parking regulation as being similar to a neighborhood scheme created by deed restrictions. Such a neighborhood scheme, like the mutual undertakings contained in the association's governing documents, is a matter of contract, Weinstein v. Swartz, 3 N.J. 80, 86, 68 A.2d 865 (1949), which may, and often does, impose greater limits on an owner's use of property than governmental restrictions, Palisades Prop., Inc. v. Brunetti, 44 N.J. 117, 134, 207 A.2d 522 (1965). While restrictive covenants cannot lessen or avoid the obligations imposed by ordinance, Pullen v. So. Plainfield Planning Bd., 291 N.J.Super. 303, 311 n. 6, 677 A.2d 278 (Law Div.1995), they can restrict the use of property otherwise uninhibited by ordinance, Brunetti, supra, 44 N.J. at 134, 207 A.2d 522; Scillia v. Szalai, 142 N.J. Eq. 92, 98, 59 A.2d 435 (Ch.1948). This analogy further suggests the parking regulation's validity since, like an enforceable neighborhood scheme, the parking regulation possesses the qualities of universality, reciprocity and reasonableness. Olson v. Jantausch, 44 N.J.Super. 380, 386, 130 A.2d 650 (App.Div.1957).
Since the regulatory conduct pursued by Panther Valley was materially different from the parking regulations which the association seeks to enforce, since there is no statutory authority prohibiting an association from enforcing its own parking regulations, and since the regulation meets all the necessary qualities of an enforceable restrictive covenant, we conclude, as similarly held by the Missouri Court of Appeals in Maryland Estates, supra, 936 S.W.2d 218, that the association was authorized to enforce its parking regulation and that it was appropriate for the judge to enter a judgment declaring its validity.
That ruling, however, did not end the parking portion of this lawsuit. Both plaintiff's claim of a right to park his vehicle on LaCosta Drive based upon an equitable estoppel theory and the association's counterclaim for injunctive relief preventing any future parking of the vehicle on LaCosta Drive remained unadjudicated by the time the matter came to trial. At the close of plaintiff's case, the judge dismissed the equitable estoppel claim, but later issued a permanent injunction despite having never set forth a reason for its issuance, contrary to the requirements of R. 1:7-4. See McCann v. Biss, 65 N.J. 301, 304 n. 2, 322 A.2d 161 (1974) ("Judges should always state their reasons so that counsel and an appellate tribunal may be fully informed."). We conclude that the injunction should be vacated.
A permanent injunction requires proof that the applicant's legal right to such relief has been established and that the injunction is necessary to prevent a continuing, irreparable injury. McCullough *210 v. Hartpence, 141 N.J. Eq. 499, 502, 58 A.2d 233 (Ch.1948). Such an injunction must be no more extensive than is reasonably required to protect the interest of the party in whose favor it is granted. Sunbeam Corp. v. Windsor-Fifth Ave., 14 N.J. 222, 232-33, 102 A.2d 25 (1953).
At the March 2002 trial, the association never rebutted plaintiff's testimony that he had stopped parking his vehicle on association streets or in his driveway by the end of 1999 and before this lawsuit was commenced. While the judge's rationale for entering the injunction is unknown, we conclude that the injunction should not have issued because of the absence of proof that plaintiff was continuing to violate the regulation or that irreparable injury was being inflicted upon the association or its members. Accordingly, we vacate the permanent injunction contained in the April 8, 2002 order.

III
Plaintiff raises another novel issue regarding the events surrounding his decision, in early November 1999, to become a candidate in the board of directors election scheduled for November 30, 1999. At that time, the skirmishes about plaintiff's vehicle were ongoing. Once plaintiff communicated his desire to run, the board exhibited an urgency to impose parking fines. A written notice, dated November 17, 1999, advised plaintiff that his vehicle was seen parked in his driveway on November 3, 5, 11 and 12, 1999 and the association would "reimpos[e] the $100.00 fine that was previously imposed ... on August 25, 1999, bring[ing] the total fines against you to $225.00." This notice demanded payment within thirty days, warning that, upon default, the board would seek the imposition of a lien.
A letter, dated November 19, 1999, was sent to plaintiff advising that the association had determined, upon the advice of counsel, that he and his wife were not currently "in good standing and eligible to vote." This letter further advised that plaintiffs could regain their eligibility by paying $225 and signing an agreement that they would "no longer park our commercial vehicle on the `property' of the Links..., including its streets and our Unit's driveway."
Also, on November 19, 1999, the board disseminated a candidate audit to all unit owners concerning the November 30, 1999 board election. This candidate audit listed the names and addresses of the six candidates for the three available seats; a description of the candidates' past or current violations of the association's rules; whether the violations were "resolved or unresolved"; and whether the candidates were in "good standing and entitled to vote." The candidate audit stated that three of the candidates had not committed any violations; it also indicated that two others had violated rules, one with regard to the parking of a vehicle and the other with the placement of a plastic storage bin, both of which were "resolved." As for plaintiff, the audit mentioned his "parking of commercial vehicles on Links `property,' including driveway ... 1997-1999," and indicated that these violations were not resolved, explaining:
Member, after 2 arbitration hearings, has been fined $225 to date, which remains unpaid, and has continued to park his commercial vehicle in driveway as recently as November 17, 1999 in violation of Rule II(G) of Arch. Control Guidelines.
The candidate audit also indicated that all candidatesexcept plaintiffwere in good standing and entitled to vote. On November 30, 1999, the unit owners voted. Plaintiff finished fifth.
*211 Plaintiff claimed that the issuance of the candidate audit was unauthorized by the governing documents and sought legal and equitable relief, including the voiding of the election, the conducting of a new election, and damages. Thus, we are required to consider whether the candidate audit was authorized and, if not, what remedy, if any, is available to redress any resulting injury or damage.

A
We agree that the governing documents neither allow nor require the board to issue a "candidate audit." While the parties dispute whether the legitimacy of the candidate audit or the accuracy of its content should be judged by either a reasonableness standard or the "business judgment" rulea common debate in litigation between boards and unit owners, see e.g., Randolph C. Gwirtzman, An Exception to the Levandusky Business Judgment Rule: Owner and Shareholder Interests in Condominium and Cooperative Board Decisions, 14 Cardozo L.Rev. 1021 (1993)the first question in any such dispute is whether the board's action was ultra vires. The association readily concedes that the governing documents do not specifically authorize the issuance of a candidate audit, but argues that it was entitled to rely upon the broad statutory authority of N.J.S.A. 15A:3-1(a)(9), (10) and (16). Plaintiff argues that there must be specific authorization in the governing documents for such actions.
While the board may be authorized to administer the election of its members, there is no specific authority, nor any logical extension of any general authority, to support the association's contention that the board could disseminate its opinions about a candidate's merit in this fashion. While the Legislature has broadly authorized such an association to adopt governing documents which would permit the association to "conduct its activities," "carry on its operations," "exercise the powers granted by this act anywhere in the universe," N.J.S.A. 15A:3-1(a)(9), or "exercise all other powers necessary or convenient to effect any of the purposes for which the corporation is organized," N.J.S.A. 15A:3-1(a)(16), the actual powers of the association must be located in the governing documents. See N.J.S.A. 15A:3-1(a) (which lists the various powers which a not-for-profit corporation may exercise "subject to any limitations ... in its certificate of incorporation or bylaws."); N.J.S.A. 46:8B-15 (which enumerates vast powers which may be exercised by a condominium association but which are "[s]ubject to the provisions of the master deed, the by-laws, rules and regulations ..."); Wendell A. Smith & Dennis A. Estis, New Jersey Condominium & Community Association Law, § 16:1 (2004) ("The association and its board have only those powers ... specifically granted by the governing documents...."). After searching for authority in the governing documents, the trial judge relied upon a bylaw which merely indicated that the board has "[t]he power to do all things incidental and necessary to the accomplishment of" its other enumerated powers. The board is empowered to take steps necessary to the running of elections, but the issuance of a candidate audit exceeds those powers. We view those actions incidental or necessary to the conducting of an election to be only those steps necessary to the casting and counting of votes, and not the providing of unsolicited information to all unit owners relating to the merits of the candidates. There was no point, other than to affect the outcome, for the board to advise the voters which of the candidates were, in its opinion, in "good standing." Considering that the existence of an outstanding parking fine did not bar plaintiff's candidacy, as *212 the association concedes, there was no legitimate reason for the association to sponsor an advertisement about the parking controversy. If the incumbent candidates felt it was important to advise unit owners of this controversy, they were free to do so through the use of their own time and funds.
Indeed, the fact that the board never before issued a candidate audit, and resolved to do so, at an unnoticed meeting never memorialized, contrary to N.J.S.A. 45:22A-46, further demonstrates that the board acted in a partisan manner[4] and beyond its authority.
Because the issuance of the candidate audit was ultra vires, the board's conduct cannot be shielded by the "business judgment" rule, which applies only when a board has the authority to make such a decision. Thanasoulis v. Winston Towers 200 Ass'n, 110 N.J. 650, 657, 542 A.2d 900 (1988); Sulcov v. 2100 Linwood Owners, Inc., 303 N.J.Super. 13, 31, 696 A.2d 31 (App.Div.1997), app. dis., 162 N.J. 194, 743 A.2d 847 (1999); Walker v. Briarwood Condo. Ass'n, 274 N.J.Super. 422, 426, 644 A.2d 634 (App.Div.1994). Only when a board's actions are authorized and of the type that justify application of the "business judgment" rule, will a court refrain from second-guessing its actions. Papalexiou v. Tower West Condo. Ass'n, 167 N.J.Super. 516, 527, 401 A.2d 280 (Ch.Div. 1979). Here, the board was not authorized to comment upon the qualifications of candidates for the board.

B
Even though the issuance of the candidate audit was not permitted by the association's governing documents, and may have impacted upon the results of the election, plaintiff is entitled to no remedy other than declaratory relief. All the other forms of relief demanded by plaintiff are either unauthorized by statute or have been lost due to the passage of time.
N.J.S.A. 15A:5-23 permits a court to "review" and ultimately "confirm the election, order a new election or provide all other relief as justice may require." Such an action should be commenced and adjudicated as soon as practicable after the election in order to render meaningful any appropriate remedy. Since board members are elected to one-year terms, we conclude that it would be pointless to require that the 1999 election results be vacated and a new election mandated, when subsequent elections have taken place and the terms of the successful 1999 candidates have already been served.
Plaintiff also sought monetary relief due to the circulation of the candidate audit. Despite the broad grant of power in N.J.S.A. 15A:5-23 to "provide all other relief as justice may require," we conclude that monetary relief is unavailable to a candidate who has lost an election, even when the results may have been skewed by the board's ultra vires conduct. Such an office has no monetary value; directors are not entitled to a salary and the office provides no benefits, only obligations. Moreover, the deprivation of its intrinsic benefits, if any, cannot be ascertained without engaging in utter speculation.
Finding no authority in N.J.S.A. 15A:5-23 for an award of monetary damages in these circumstances and concluding that the undue passage of time eviscerated the court's ability to issue any remedy for the board's wrongful intervention in the November *213 1999 election through the unauthorized issuance of a candidate audit, we affirm the trial judge's rejection of plaintiff's claim. However, we will remand for the entry of an amended judgment declaring that the issuance of the candidate audit was unauthorized by the governing documents.

IV
Plaintiff also claimed that he was defamed by the candidate audit. The trial judge dismissed this claim, concluding that plaintiff was a public figure who failed to provide evidence of actual malice sufficient to defeat the association's motion for partial summary judgment.
The actual malice standard requires that a plaintiff demonstrate, by clear and convincing evidence, that the alleged defamatory statement was made with knowledge of its falsity or with reckless disregard for the truth. Lynch v. New Jersey Educ. Ass'n, 161 N.J. 152, 165, 735 A.2d 1129 (1999); Standridge v. Ramey, 323 N.J.Super. 538, 544, 733 A.2d 1197 (App.Div.1999). To prove a statement was made or published with reckless disregard for the truth, a plaintiff must show that the statement was made with a "high degree of awareness of [its] probable falsity," Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964), or with "serious doubts" as to the truth of the publication, St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968). To be actionable, "the recklessness in publishing material of obviously doubtful veracity must approach the level of publishing a `knowing, calculated falsehood.'" Lynch, supra, 161 N.J. at 165, 735 A.2d 1129 (quoting Lawrence v. Bauer Publ'g & Printing Ltd., 89 N.J. 451, 466, 446 A.2d 469 (1982)).
In ascertaining whether the actual malice standard should be applied, consideration has to be given to whether plaintiff is a public official, New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964), a public figure, Curtis Publ'g Co. v. Butts, 388 U.S. 130, 154, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967), or a limited purpose public figure, Gertz v. Robert Welch, Inc., 418 U.S. 323, 351, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789, 812 (1974). In essence, a person invites the application of the actual malice standard by "voluntarily and knowingly engag[ing] in conduct that one in his position should reasonably know would implicate a legitimate public interest, engendering the real possibility of public attention and scrutiny." Sisler v. Gannett Co., 104 N.J. 256, 274, 516 A.2d 1083 (1986).
Little has been said about whether individuals involved in the governance of planned communities, or individuals who speak out about issues involving such communities, have invited "attention and comment" to a degree that they should be considered public figures. Guidance, however, is provided by a decision outside our jurisdiction. In Damon v. Ocean Hills Journalism Club, 85 Cal.App.4th 468, 102 Cal.Rptr.2d 205 (2000), the court considered statements made about the competency of a former manager of a homeowners association in connection with the community's decision to continue to be self-governed or to retain a professional management company that were published in a newsletter privately disseminated by community members. The court in Damon found that the statements in question "concerned the very manner in which this group of more than 3,000 individuals would be governedan inherently political question of vital importance to each individual and to the community as a whole." Id. at 212-13. Observing that the statements *214 were made in connection with board elections and recall campaigns, the court held:
The right to speak on political matters is the quintessential subject of our constitutional protections of the right of free speech. Public discussion about the qualifications of those who hold or who wish to hold positions of public trust presents the strongest possible case for applications of the safeguards afforded by the First Amendment.... For many Californians, the homeowners association functions as a second municipal government.
[Id. at 213.]
This statement is no less true in New Jersey, which is "among the states in which residential community associations are most common." Mulligan v. Panther Valley Prop. Owners Ass'n, 337 N.J.Super. 293, 301, 766 A.2d 1186 (App.Div.2001) (citing David J. Kennedy, Residential Associations as State Actors: Regulating the Impact of Gated Communities on Nonmembers, 105 Yale L.J. 761, 793 n. 24 (1995)).
As a candidate for election to the association's board of directors, plaintiff thrust himself into a spotlight which justified viewing him as a public figure for the limited purpose of his candidacy. A prime example of this type of public figure can be found in Lawrence v. Bauer Publ'g, supra, where our Supreme Court held that the president of a privately-organized taxpayers association became a limited purpose public figure by "inject[ing] himself into the forefront" of a public controversy about what his organization believed was an excessive appropriation for a city firehouse and which formed the background for the alleged defamation. 89 N.J. at 464, 446 A.2d 469.
In a similar vein, candidates for public office, who never achieve the status of public official because of lack of success at the polls, nevertheless take on the garb of public figures for the limited purpose of their candidacy. This not only includes candidates for public office on a national level, see Monitor Patriot Co. v. Roy, 401 U.S. 265, 271, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971) (candidate for the United States Senate), but also candidates for public office on a local level, see Brown v. Herald Co., 698 F.2d 949, 951 (8th Cir.1983) (candidate for sheriff); Peeler v. Spartanburg Herald-Journal, 681 F.Supp. 1144, 1147 (D.S.C.1988) (candidate for school board); Collins v. Cox Enters., Inc., 215 Ga.App. 679, 452 S.E.2d 226, 227 (1994) (candidate for state public-service commissioner); Redmond v. Sun Publ'g Co., 239 Kan. 30, 716 P. 2d 168, 171 (1986) (candidate for city council); Romero v. Abbeville Broadcasting Serv., Inc., 420 So.2d 1247, 1249 (La. App.1982) (candidate for sheriff); Mastandrea v. Lorain Journal Co., 65 Ohio App.3d 221, 583 N.E.2d 984, 987 (1989) (candidate for mayor), app. dis., 50 Ohio St.3d 701, 553 N.E.2d 276, cert. denied, 498 U.S. 822, 111 S.Ct. 73, 112 L.Ed.2d 46 (1990); Weaver v. Pryor Jeffersonian, 569 P.2d 967, 973 (Okla.1977) (candidate for sheriff), as well as candidates for appointments to public agencies, see Moffatt v. Brown, 751 P.2d 939, 941 (Alaska 1988) (doctor seeking appointing to medical board), and union office, see Materia v. Huff, 394 Mass. 328, 475 N.E.2d 1212, 1215 (1985).
We conclude that plaintiff, as a candidate for the board of directors of the association, should be deemed a limited purpose public figure since he was a candidate for a position essentially indistinguishable from a member of a town's governing body. The board of this association performs many quasi-municipal functions in order to provide the owners with what they sought upon purchasing their townhousesa stable, planned environment. *215 Accordingly, the application of the actual malice standard is appropriate in these circumstances so there may be the opportunity, in the community, for free and robust communications regarding an individual's candidacy to the body which governs life in the community. With the application of the heightened standard requiring clear and convincing proof of actual malice, "would-be critics" would not be deterred from "voicing their criticism." New York Times v. Sullivan, supra, 376 U.S. at 279, 84 S.Ct. at 725, 11 L.Ed.2d at 706; see also Dairy Stores, Inc. v. Sentinel Publ'g Co., 104 N.J. 125, 157, 516 A.2d 220 (1986) ("[T]he fear of [being sued for defamation] can inhibit comment on matters of public concern."). It follows that the trial judge correctly determined that the actual malice standard should be applied to the statements about which plaintiff complained.
Plaintiff's defamation claim fell well short of this standard even though there are aspects of the statements about plaintiff in the candidate audit which may not be technically accurate. For example, the candidate audit contains the statement that plaintiff "had been fined $225 to date, which remains unpaid." Included within that amount was the most recent attempted fine which could not have attached even if it is assumed that the association was authorized to issue parking fines[5] since the bylaws prohibit the imposition of an assessment without notice and the passage of ten days, which could not have occurred by the time the candidate audit was issued. Thus, while it might be accurate to say that plaintiff had been fined $225, it was questionable whether this fine had been legitimately imposed.
Notwithstanding, we conclude that any alleged inaccuracies in the candidate audit conveyed no defamatory meaning. The only statement which might be sufficiently significant to "lower the subject's reputation in the estimation of the community," Lynch, supra, 161 N.J. at 164-65, 735 A.2d 1129, was the assertion that plaintiff was not a member in "good standing." However, such a statement should not be viewed as a false statement of fact but as an opinion about a claim or controversy which would only be redressable if a reasonable factfinder could conclude that the statements imply reasonably specific assertions of underlying objective facts that are false. Ward v. Zelikovsky, 136 N.J. 516, 531, 643 A.2d 972 (1994) (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-20, 110 S.Ct. 2695, 2705-06, 111 L.Ed.2d 1, 17-18 (1990)). In the particular circumstances presented, there is no doubt that the candidate audit merely constituted an opinion about plaintiff's eligibility to vote. See Gertz, supra, 418 U.S. at 339-40, 94 S.Ct. at 3006-07, 41 L.Ed.2d at 805 ("Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."). As plaintiff so forcefully and accurately contends, the governing documents contain no definition of what it means to be in "good standing." Accordingly, any claim that an individual was or was not in "good standing" would be an opinion of that individual's relationship with the association and not the representation of a known fact.
For these reasons, and recognizing that summary judgment is "particularly appropriate for disposing of non-meritorious defamation suits," Rocci v. Ecole Secondaire MacDonald-Cartier, 165 N.J. 149, 158, 755 A.2d 583 (2000), we conclude that the trial *216 judge correctly granted summary judgment dismissing plaintiff's defamation claim.

V
The association argues, in its cross-appeal, that the trial judge erroneously deprived it of an award of the attorneys' fees and costs incurred in this lawsuit. We are hampered in our review of this issue because the judge's written decision denying the association's claim for fees and costs stated only that he relied upon the arguments asserted by plaintiff, a practice which does not comport with the requirements of R. 1:7-4. See Esposito v. Esposito, 158 N.J.Super. 285, 291, 385 A.2d 1266 (App.Div.1978). Nevertheless, we interpret the judge's holding to mean that he found no legal basis for such an award because he either concluded that R. 4:42-9 does not authorize a fee award in this type of case or that the bylaw in question has a limited application.[6]
Plaintiff's opposition to the association's post-trial motion predominantly argued that R. 4:42-9 precluded such an award. This is not accurate, since R. 4:42-9 does not prohibit an award of fees permitted by contract. See Satellite Gateway Comm., Inc. v. Musi Dining Car Co., 110 N.J. 280, 286, 540 A.2d 1267 (1988); Pressler, Current N.J. Court Rules, comment on R. 4:42-9 (2004). The association's bylaw authorizes the imposition of fees and costs, stating that the board has
The duty to collect delinquent charges or assessments made by the Neighborhood Association through the Board of Directors against any Unit and the Owner thereof, together with such costs and expenses incurred in connection therewith, including, but not limited to, court costs and attorneys' fees, whether by suit or otherwise, to abate nuisance and enforce observance of the rules and regulations relating to The Links at Valleybrook by injunction or such other legal action or means as the Board of Directors may deem necessary or appropriate.
[Emphasis added.]
Contrary to plaintiff's assertion, this provision does not apply only when the association commences the action. Indeed, that would be quite an artificial basis upon which to judge the availability of such an award. If we were to agree that being a plaintiff is the determinative factor, then it will not be long before clever unit owners, embroiled in such controversies, will simply out-race their adversaries to the courthouse and file complaints seeking declaratory relief, thus reserving only for themselves the title "plaintiff." In that way, the availability of a fee award would turn on which party more quickly sued the other. We reject this formalistic and illogical approach.
Instead, as the language of the bylaw unmistakably indicates, the association is permitted an award of its reasonable fees and expenses when successful in obtaining the abatement of a nuisance or when successful in obtaining enforcement of its rules or regulations. The bylaw, however, is silent regarding the imposition of fees and costs when only a declaratory judgment as to the validity of a rule or regulation is requested and, because of this silence, we conclude that a fee award is not available in that circumstance.
Plaintiff sought a declaratory judgment regarding the validity of the parking regulation, while the association sought the collection of its previously-imposed *217 fines and the issuance of an injunction prohibiting any further violations. We conclude that the bylaw would permit an award of fees against a unit owner if the association had been successful with its counterclaim for monetary or injunctive relief, but not with regard to its claim, or defense of plaintiff's claim, for declaratory relief. The language of the bylawwhich should be narrowly read in that it is a fee-shifting agreement, see McGuire v. City of Jersey City, 125 N.J. 310, 326-27, 593 A.2d 309 (1991)does not permit an award of fees relating to claims for declaratory relief. We believe this to be the only sensible interpretation since a broader reading would tend to invite costly academic disputes about the meaning or validity of the association's regulations.
The association failed to obtain the abating of a nuisance or the enforcement of its regulations. Instead, as the evidence revealed, this so-called nuisance had ended before the lawsuit began. The association also withdrew its claim for the collection of its previously-imposed fines and we have vacated the injunction sought, and erroneously issued, because, again, plaintiff had long since been in compliance with the regulation in question.
As a result, we conclude that the association was not entitled to a fee award, since the fees and costs expended in this lawsuit did not result in the obtaining of a favorable result within the narrow confines of its bylaw.

VI
We affirm (1) the partial summary judgment, declaring the parking regulation to be valid and enforceable, (2) the partial summary judgment, dismissing plaintiff's defamation claims, (3) the involuntary dismissal of plaintiff's equitable estoppel claim, (4) the denial of plaintiff's claim for attorneys' fees, and (5) the denial of the association's claim for an award of counsel fees, but we reverse (6) the permanent injunction entered in favor of the association.
We also affirm that part of the April 8, 2002 order which dismissed plaintiff's candidate audit claim because, at this late date, there is no remedy available to plaintiff. Insofar as that order silently denied plaintiff's claim for a declaratory judgment, we reverse and remand for the entry of an amended judgment declaring that the candidate audit was unauthorized by the governing documents.
NOTES
[1] Plaintiff and his wife attempted to commence this action in the General Equity Part, but the Chancery judge directed its filing in the Law Division.
[2] Gloucester has an overnight parking regulation applicable throughout the township prohibiting the parking of vehicles weighing more than 3,000 pounds between the hours of 9:00 p.m. and 6:00 a.m. Plaintiff testified at trial, without contradiction, that his van weighed less than 3,000 pounds and, thus, the ordinance would not prohibit him from parking it on LaCosta Drive.
[3] Panther Valley determined that this statute did not apply to the particular community in question which consisted of a mix of single family residences, townhouses and a small minority of condominium units.
[4] We are mindful, in this regard, of the unrebutted evidence that Murray J. Rubin, one of the members of the board who was seeking re-election in November 1999, was instrumental in the preparation and issuance of the candidate audit.
[5] We intimate no view as to whether the association had the power to issue fines. The association's withdrawal of its claim to collect fines rendered this issue moot.
[6] We would ordinarily remand for clarification from the trial judge but, because of the judge's untimely death, this avenue is not open to us.