Filed 12/5/16; pub. order 12/8/16 (see end of opn.) (reposted to correct date of pub. order)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| NANCY ANN LEE et al., | D068835 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-215-00009400-CU-MC-CTL) |
| SIL SILVEIRA et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Reversed with directions.

Neuland, Whitney & Michael, Frederick T. Whitney and Constance Trinh for Defendants and Appellants.

Aguirre & Severson, Michael J. Aguirre and Maria C. Severson for Plaintiffs and Respondents.

This action was brought by three members of the board of directors (board) of the Friars Village Homeowners Association (FVHOA) against six other board members and

the FVHOA manager[1] but, surprisingly, *not* against FVHOA itself—despite the fact the dispute focuses on the activities of the board and its governance of FVHOA and the Friars Village community.

Friars Village is comprised of 440 townhouses located in San Diego. The three board members, former plaintiff Lance McDonald (McDonald)[2] and plaintiffs and respondents Nancy Ann Lee (Lee) and Patricia Jean Rocha (Rocha) (sometimes collectively plaintiffs), sued defendants and appellants Sil Silveira (Silveira), Shelley Smith (Smith), Wilfried Birleanu (Birleanu), Anne Durst (Durst), Helen Fox (Fox) and John Nielsen (sometimes collectively director defendants) following a board vote of six-to-three to renew an FVHOA managerial contract—in which plaintiffs voted against such renewal.

Director defendants timely moved under Code of Civil Procedure section 425.16[3] to strike the complaint of plaintiffs, which consisted of a single claim for declaratory relief. Director defendants argued the complaint was based on decisions and statements they made in duly noticed board meetings while conducting board business and, thus,

[1]    Defendants ARK Management Group, LLC, a California Limited Liability Company (ARK LLC), Vicki MacHale (MacHale), the executive director of ARK LLC and the general manager of FVHOA, and Kathy Young, the facilities director of ARK LLC (sometimes collectively manager defendants) are not parties to this proceeding.

[2]    McDonald filed a voluntary dismissal in late April 2015, after the complaint was filed.

[3]    All further statutory references are to the Code of Civil Procedure. Section 425.16 is commonly referred to as the anti-SLAPP statute. (*Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1568.) "SLAPP is an acronym for 'strategic lawsuit against public participation.' " (*Jarrow Formulas*, *Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

involved acts or activities in furtherance of constitutionally protected activity within the meaning of the anti-SLAPP statute.

The trial court denied the motion. In so doing, it ruled that the "only relief" sought by plaintiffs was a "determination of what [was] required under the HOA governing documents" and, as such, that plaintiffs' declaratory relief cause of action did not arise out of director defendants' "speech/petition rights." The court therefore never reached the issue of whether plaintiffs could satisfy their burden under subdivision (b)(1) of section 425.16 to establish a probability of success on their claim.

As we explain, we independently conclude the court erred when it found the gravamen of plaintiffs' complaint did not involve protected activity under section 425.16. We further conclude plaintiffs cannot show a probability they will prevail on their claim. Therefore, we reverse the order denying the special motion to strike of director defendants and direct the trial court to grant that motion with respect to each such defendant.

## FACTUAL BACKGROUND

The following is taken from the allegations in the complaint and the declarations and evidence proffered in connection with the anti-SLAPP motion.

At all times relevant, the FVHOA board consisted of nine resident homeowners, each of whom served a staggered three-year term. At the time they filed their March 2015 complaint, plaintiffs McDonald (elected in 2014), Lee (2014) and Rocha (2012) sat on the board. Shortly after service of the complaint, defendants Durst (2012), Fox (2013) and Nielsen (appointed) resigned from the board, while Silveira (2010, 2013), Smith

3

(2011, 2014) and Birleanu (2013) remained as active board members. The complaint, which referred to director defendants as the " '[m]ajority [b]lock,' " alleged they "developed an affinity for one another as they bec[a]me closely connected and mutually dependent on another as they carried out the *wrongful conduct* alleged." (Italics added.)

The complaint alleged that, in March 2011, FVHOA entered into an " 'All-Inclusive Contract' " with Stos-Robinson Companies, a California corporation dba ARK Management (Stos-Ark) (sometimes March 2011 contract). Under the terms of the March 2011 contract, Stos-Ark agreed to provide FVHOA with financial management services; to maintain and manage its common areas; to supervise third-party contractors; and to advise the board and its committees in the day-to-day operations of FVHOA, among many other duties.

In October 2013, ARK LLC was formed. About a month later, it acquired the property management business belonging to Stos-Robinson Companies, including Stos-ARK. Following the acquisition of Stos-ARK by ARK LLC, the board—on behalf of FVHOA—executed a March 13, 2014 contract with ARK LLC (sometimes March 2014 contract).

The March 2014 contract included a term for automatic renewal, which provided: "Commencing on June 1, 2014 and hereinafter from year-to-year [*sic*]. If notification by either party of their intent not to renew this Agreement for one additional year is not received by the other party in writing at least sixty (60) days prior to the expiration date of this Agreement, this Agreement shall automatically renew in full force and effect for the ensuing one-year period, commencing on the date after the final day of the previous

4

term. The renewal deadline date will be included on the annual calendar and [ARK LLC] will provide at least [a] 120 day reminder of contract renewal to the [b]oard."

On February 7, 2015, director defendants and plaintiffs attended a board meeting to discuss renewal of the March 2014 contract. The complaint alleged that, during the meeting, plaintiffs requested the board seek additional bids for the management contract and even volunteered to obtain such bids before the next board meeting. However, director defendants believed the board should renew the March 2014 contract for one more year. Each director defendant testified that, while he or she was open to a new management company, he or she was concerned it would be "difficult for a new management company to step in and assist in the oversight" of the "extensive renovation projects" that were then occurring at Friars Village.

Following a discussion of ARK LCC's performance under the March 2014 contract and of the need for a "well-thought out request for proposal" before seeking bids for a new management contract, and after each board member had expressed his or her views regarding renewal of the March 2014 contract, Silveira made a motion to approve the management contract, "subject to the advice of counsel" that the minor changes did not constitute a new contract.[4] Durst seconded the motion, and the motion was put to vote, which, as noted, passed six to three with plaintiffs voting against renewal.

---

[4] Although the record is silent on this matter, ostensibly counsel subsequently advised the board the minor modifications to the March 2014 contract did not constitute a new contract, inasmuch as the board's motion to renew that contract was "subject to" receiving such advice.

5

Plaintiffs' complaint alleged director defendants failed to follow proper bid procedures when they voted in 2015 to renew the March 2014 contract. It further alleged director defendants unlawfully delegated board duties to MacHale, which "caused monetary damage[s] to the residents of Friars Village [that the board was] sworn to serve and to which [the board owed] a fiduciary duty."

Specifically, plaintiffs alleged that director defendants "did not permit sufficient bids to ensure FVHOA paid the best price for its manager"; that MacHale, as "agent of the prior manager [i.e., Stos-ARK], exposed FVHOA to wage-and-hour violations of California law"; that MacHale "orchestrated a settlement in which the FVHOA insurance policy was tapped to pay for the settlement," resulting "in a substantial increase in the insurance premiums FVHOA is required to pay for insurance"; that director defendants "obstructed any due diligence" into manager defendants' conduct, refused to permit a "bona fide bidding process to be followed in selecting the FVHOA manager" and instead "automatically approved contracts" hiring MacHale and ARK LLC as FVHOA manager; that the board voted on the ARK LLC management contract "without negotiating or seeing the terms of the new proposed contract, and without performing an annual review as called for in the governing documents"; and that the extension of the March 2014 contract "involved material changes in terms and otherwise required three bona fide bids" to ensure the board on behalf of FVHOA obtained the "best price available for its manager."

Plaintiffs' complaint further alleged that director defendants "adopted policies in violation of the rights of plaintiffs to carry out their respective responsibilities and duties

6

as directors and officers of the FVHOA"; and that director defendants allowed MacHale to control the bidding process on FVHOA projects including making a recommendation on the bid winner, which was then approved by director defendants in a "rubber stamp vote." As a result, the complaint alleged neither FVHOA nor its members "receive[d] the benefits of the best prices" for such services and products.

As particularly relevant to the anti-SLAPP motion, the complaint alleged that the board allowed the Friars Village "roofing project" to escalate to about $900,000, when that project initially "was limited to six buildings" involving four bids obtained by the board in March 2013, which bids ranged from about $167,000 to about $350,000; that none of these four bids was accepted; that the board awarded the bid for the roofing work to RE Reconstruction Experts, Inc. (RE), whose bid of about $296,000 was submitted about two months after the original bids; and that the contract with RE increased from about $296,000 to $320,000.

The complaint continued that director defendants subsequently approved a "change order that increased the RE . . . contract from $320,000 to $777,446 -- an increase of $442,446"; that the board later agreed to an additional increase that brought the RE contract up to about $841,000; that the bids on the roofing project were not in any event open to the public; and that director defendants ignored complaints about the bidding process.

MacHale in her declaration in support of director defendants' anti-SLAPP motion testified the roofing project "was prompted due to the deterioration of numerous roofs throughout the [FVHOA], which, if not remedied, would result in water intrusion into the

7

residences and damage to the buildings. The [FVHOA] retained Fred Baron, a licensed architect, to evaluate the roofs to identify the buildings that most required maintenance, and establish a priority schedule in accordance with the urgency for repair. The roofs were graded one through five, with the most urgent roofs as level one."

According to MacHale, the board received more than three bids in connection with the roofing project. Ultimately, the board voted to approve RE's bid of about $296,000, which included a $24,000 "option for upgraded materials" that the board also approved, for a total contract price of about $320,000.

The record shows Silveira, Smith, Durst and Fox[5] were on the board when it voted to approve the Friars Village roofing project. Silveira in her declaration in support of the anti-SLAPP motion testified that on May 15, 2013, she attended a board meeting to discuss the roofing project and the several bids the board had received in connection with that project; that she reviewed the "various vendors and proposals, evaluated their quotes, reputation and prior experience, and made a determination as to which contractor, in [her] opinion, was most suitable. Following discussion of each of the director's viewpoints regarding the possible vendors, a director made a motion to accept RE[']s proposal to complete six (6) of the priority level one roofs, which was seconded, and put to a vote.

---

[5]  Conversely, Birleanu testified she was not elected to the board until November 2013—*after* both the May and September 2013 board meetings when the board approved and extended, respectively, the roofing project. It further appears from the parties' briefs that Nielsen also was not on the board in May and September 2013 when it considered and voted on the roofing project. As discussed *post*, neither Birleanu nor Nielsen can be responsible as a member of the "majority block" for allegedly approving, without the required number of bids, the roofing project—including its "next phase"—when they were not then serving on the board.

The motion passed six (6) votes in favor of the motion, including [her] vote, and one (1) opposed vote."

Silveira testified that at the September 18, 2013 meeting, the board addressed the "next phase" of the roofing project. At that meeting, the board discussed "whether to complete the remaining portion of the Priority Level One roofs by way of a change order with the current contractor, RE . . . . [Silveira] believed that in light of the pending rainy season, this phase of the [r]oofing [p]roject should be completed by change order, in light of the most recent competitive bids received just months prior. RE . . . agreed to complete the remaining seven roofs at the same pricing as initially quoted in the first phase of the contract. Following discussion of each of the director's viewpoints, a director made a motion to continue the [r]oofing [p]roject under the current contract with RE . . . , which was seconded and put to a vote. The motion passed with five (5) votes in favor, including [her] vote, and one (1) opposed."

In explaining the cost to complete the next phase of the roofing project, Silveira further testified that although the "unit pricing was the same, the total square footage of the seven additional buildings was larger, therefore the cost of the next phase was $474,265.69. Additionally, during the process of reroofing, there were several problems, including one building that had significant damage to the main support beam, which cost

9

an additional $46,552 to remedy.  Thus, the total amount of the roofing project at this point [was] $840,829."[6]

The complaint also alleged there was retaliation by one or more director defendants, on the one hand, against one or more plaintiffs or members of FVHOA, on the other hand.  The complaint specifically alleged Silveira, at all times relevant the president of FVHOA, retaliated against McDonald after he joined the board in November 2014 and became its treasurer.  With respect to retaliation against FVHOA members, the complaint alleged when a member raised concerns about whether FVHOA money should be maintained in an out-of-state bank as opposed to a California bank, the member received a cease and desist letter from contracted legal counsel of the board.  The complaint provided other examples of such alleged retaliation by director defendants, including in connection with a "water project" undertaken by the board.[7]

---

[6]     We note the declarations of Smith, Durst and Fox in support of their anti-SLAPP motion provided nearly similar, and in one case identical, testimony to that given by Silveira with respect to the roofing project.

[7]     We note the complaint is entirely devoid of allegations concerning the "water project," including when that project was voted on by the board, in contrast to the complaint's detailed allegations concerning the roofing project and the ARK LLC management contract, as summarized *ante*.  In fact, the 14-page complaint first mentions the "water project" on page nine and then only in passing in connection with plaintiffs' allegation that the board allegedly retaliated against 91 FVHOA members for *complaining* about that project.  The complaint next generally mentions this project when it asserts the board was required to obtain at least three bids before it could "award contracts, including those contracts for HOA manager, or roofing and water projects" and repeats this same general language in its prayer for relief.  We thus do not consider the "water project" to be at issue in this case in connection with plaintiffs' request for a judicial declaration.

10

In addition to not following proper bidding procedures, as summarized *ante*, the complaint alleged that director defendants refused to allow the board secretary to "take verbatim transcripts of meetings of the FVHOA because they d[id] not want an accurate record made of their actions and decisions"; that director defendants instead had "empowered ARK LCC to produce minutes of the FVHOA [b]oard meetings, rather than the [s]ecretary"; and that director defendants allowed ARK LCC to "impose onerous default fees on members of the FVHOA."

PRAYER FOR RELIEF AND REFINEMENT OF DISPUTE

As noted, the complaint consisted of a single cause of action for declaratory relief. However, the prayer for relief sought a declaration as follows "under the FVHOA governing documents" on *nine* different subject matters:

"(1) that at least three bids are required before the FVHOA can award contracts in material amounts;

"(2) that proper bidding procedures must be followed before awarding contracts, including the contracts for the manager [and] roofing . . . projects;

"(3) that the duly-elected Secretary may make a verbatim record of what is said at the FVHOA Board Meetings;

"(4) that the Secretary is the officer charged with the duty of ensuring the accuracy of the minutes before they are submitted to the FVHOA Board;

"(5) contactors doing business with the FVHOA and FVHOA members should be free of conflicts of interests;

11

"(6) the FVHOA should not enter into contracts based upon former employees using confidential information obtained while at [Friars Village];

"(7) that FVHOA Board members should not disclose confidential information of the FVHOA with MacHale as agent for ARK LLC;

"(8) that the FVHOA Treasurer should not be retaliated against by the [m]ajority [b]lock and MacHale because he raised legitimate concerns about the FVHOA reserve deficiency, and raised ways of reducing FVHOA costs; and

"(9) that the FVHOA or Defendants MacHale or ARK LLC not be permitted to retaliate against Association members for their lawful public participation or questions of their Board."

Perhaps because their complaint sought declaratory relief on so many broad subject matters or because the trial court at the hearing on the anti-SLAPP motion found plaintiffs' complaint was "not a model of clarity," on appeal plaintiffs argue that director defendants seek to evade a requested judicial declaration on the following *two* subject matters: "(1) the FVHOA board has to obtain 3 bids for FVHOA projects involving hundreds of thousands of dollars, and (2) the FVHOA can keep verbatim notes . . . ."[8]

---

8      Plaintiffs on appeal have wisely limited the subject matters in which they seek a judicial declaration, inasmuch as several of the nine (i.e., Nos. 1, 5, 6, 7, 8 & 9, *ante*) do not appear to involve a justiciable controversy. (See *Green v. Travelers Indemnity Co.* (1986) 185 Cal.App.3d 544, 557 [noting the " 'actual controversy' referred to in [section 1060] is one which 'admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an *advisory opinion* upon a particular or hypothetical state of facts' " (italics added)]; see also *Stonehouse Homes LLC v. City of Sierra Madre* (2008) 167 Cal.App.4th 531, 540 [noting that "[w]hether a

12

With regard to the bidding issue, as relevant here plaintiffs on appeal further argued that the "dispute that forms the basis of the case" arose in connection with the "roofing contract" and the "contract with the FVHOA manager."

As noted, the trial court denied the special motion to strike of director defendants.

DISCUSSION

A. *Guiding Principles*

A court employs a two-step analysis in determining whether a claim should be stricken under the anti-SLAPP statute. (§ 425.16, subd. (b)(1).) In the first step, the defendant bears the initial burden of making a prima facie showing that the claim "aris[es] from any act of that person in furtherance of the person's right of petition or free speech." (*Ibid.*; see *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 473 (*Damon*).)

Subdivision (e) of section 425.16 provides that an " 'act in furtherance of a person's right of petition or free speech' " under subdivision (b)(1) of section 425.16 includes, as relevant here, "(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

---

case is founded upon an 'actual controversy' centers on whether the controversy is justiciable"].)

13

If the defendant meets this threshold burden, in the second step the burden then shifts to the plaintiff to "establish[ ] that there is a probability that the plaintiff will prevail on the claim."  (§ 425.16, subd. (b)(1); see *Kleveland v. Siegel & Wolensky, LLP* (2013) 215 Cal.App.4th 534, 548 (*Kleveland*).)

"Under section 425.16, subdivision (b)(2), the trial court in making these determinations considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' [Citation.]  For purposes of an anti-SLAPP motion, '[t]he court considers the pleadings and evidence submitted by both sides, but does not weigh credibility or compare the weight of the evidence.  Rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff . . . .' [Citation.]"  (*Kleveland*, *supra,* 215 Cal.App.4th at p. 548.)  "These determinations are legal questions, and we review the record de novo."  (*Damon*, *supra*, 85 Cal.App.4th at p. 474.)

### B.  *Threshold Burden*

As noted, a defendant can meet the burden of making a threshold showing that a claim arises from protected activity by demonstrating the act or acts underlying the plaintiff's claim falls within one of the four categories identified in section 425.16, subdivision (e).  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)

### 1.  Public Forum

For purposes of the third category in subdivision (e) of section 425.16, a " 'public forum' is traditionally defined as a place that is open to the public where information is freely exchanged."  (*Damon*, *supra*, 85 Cal.App.4th at p. 475.)  This court in *Damon*

concluded the board meetings of a homeowners association constituted a public forum within the meaning of the anti-SLAPP statute because they "serve[ ] a function similar to that of a governmental body. As our Supreme Court has recognized, owners of planned development units ' "comprise a little democratic subsociety . . . ." ' [Citations.] In exchange for the benefits of common ownership, the residents elect a[ ] legislative/executive board and delegate powers to this board. This delegation concerns not only activities conducted in the common areas, but also extends to life within ' "the confines of the home itself." ' [Citation.] A homeowners association board is in effect 'a quasi-government entity paralleling in almost every case the powers, duties, and responsibilities of a municipal government.' " (*Ibid.*)

Furthermore, "[b]ecause of a homeowners association board's broad powers and the number of individuals potentially affected by a board's actions, the Legislature has mandated that boards hold open meetings and allow the members to speak publicly at the meetings. [Citations.] These provisions parallel California's open meeting laws regulating government officials, agencies and boards. [Citation.] Both statutory schemes mandate open governance meetings, with notice, agenda and minutes requirements, and strictly limit closed executive sessions." (*Damon*, *supra*, 85 Cal.App.4th at p. 475.)

We concluded in *Damon* that the alleged defamatory statements made by the defendants about the plaintiff during a duly noticed board meeting met the statutory definition of a "public forum" as provided in subdivision (e)(3) of section 425.16. (*Damon*, *supra*, 85 Cal.App.4th at pp. 474–475.)

15

Much like the board of directors of the homeowners association in *Damon*, the FVHOA board necessarily functioned similar to a quasi-governmental body: it promulgated and enforced policies and rules, and voted on and approved projects, that directly affected the lives of FVHOA members who lived in the 440 townhouses that comprised Friars Village.

What's more, the acts of director defendants that are the primary focus of plaintiffs' complaint occurred in, or were made in connection with, meetings of the board as it was conducting board business. This included director defendants' alleged failure to obtain at least three bids with respect to the roofing project and the renewal of the ARK LLC management contract and their refusal to allow the board secretary to take verbatim board minutes. On this record, we therefore independently conclude the meetings of the board in which director defendants allegedly engaged in such "wrongful conduct" constituted a "public forum" within the meaning of subdivision (e)(3) of section 425.16.

2. Issue of Public Interest

"The definition of 'public interest' within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity. [Citations.] ' "[M]atters of public interest . . . include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals." ' " (*Damon*, *supra*, 85 Cal.App.4th at p. 479.)

16

Here, we independently conclude the acts of director defendants that are the "*principal thrust* or *gravamen*" (see *Martinez v. Metabolife Intern., Inc.* (2003) 113 Cal.App.4th 181, 188) of plaintiffs' complaint—as more precisely defined by plaintiffs on appeal—concerned matters of "public interest" within the meaning of subdivision (e)(3) of section 425.16.  Indeed, director defendants' decisionmaking process and debate in approving both the roofing project, which affected multiple buildings in Friars Village, and the ARK LLC management contract, which management entity was responsible for the day-to-day operations of FVHOA and the Friars Village community, impacted a broad segment, if not all, of FVHOA members.  (See, e.g., *Country Side Villas Homeowners Assn. v. Ivie* (2011) 193 Cal.App.4th 1110, 1118 [noting a homeowner's complaints about the actions of a homeowners association board in connection with the repair and replacement of balconies and shingle siding were matters of "public interest" within the meaning of section 425.16 because, even if not all of the members' balconies and siding needed repair or replacement, the board's decision "affected all members of the association" as the expenses to make these repairs would be "borne by all"]; *Cabrera v. Alam* (2011) 197 Cal.App.4th 1077, 1082 [noting a defendant's statements at a homeowners association meeting in which the defendant was seeking reelection to the board of directors of the association involved protected activity because such statements "concerned an issue of public interest, namely, the qualifications of a candidate for office in the association"].)

Plaintiffs contend their declaratory relief claim does not implicate section 425.16, subdivision (e)(3) because this law "applies to statements, not actions."  In support of this

17

contention, plaintiffs principally rely on *Talega Maintenance Corp. v. Standard Pacific Corp.* (2014) 225 Cal.App.4th 722 (*Talega*).

There, the plaintiff homeowners association sued two developers for construction defects with respect to certain trails that were badly damaged during rains in 2005 and again in 2010. Of significance here, the suit also named three former employees of one of the developers who, upon formation of the board, were appointed to represent the interests of the developer. The three former employees then comprised a majority of the board. In 2005, these three board members represented that the homeowners association, as opposed to the developers, were responsible for the damage to the trails. The complaint alleged these three board members then knew, "but failed to disclose, that under the relevant controlling documents, the [d]evelopers were responsible for the cost of repairs." (*Talega*, *supra*, 225 Cal.App.4th at p. 726.)

In 2010, when the trails were again damaged by heavy rains, the board of the homeowners association was then comprised of "independent" members. (*Talega*, *supra*, 225 Cal.app.4th at p. 726.) As a result, the board of directors hired its own consultants who, after investigation, determined "for the first time that the [d]evelopers were bound forever to provide repairs to the [t]rails, that the [t]rails were not actually completed, and that the [t]rails' failures were likely the result of construction defects." (*Id.* at p. 727.) In response, the plaintiff homeowners association sued the developers *and* the three former employees of the developer for breach of fiduciary duty, fraud, constructive fraud and negligence. As relevant here, the three developer board members moved under section 425.16 to dismiss all four causes of action. (*Talega*, at p. 727.)

18

In affirming the trial court's denial of the anti-SLAPP motion of the developer board members, the *Talega* court noted it could "immediately rule out all but the fraud cause of action" because the thrust or gravamen of the homeowners association's action against the developer board members was "principally based on . . . withholding information and improperly directing the expenditure of funds," which acts, the court further noted, were not " 'written or oral statements' " within the meaning of subdivisions (e)(1), (2) and (3) of section 425.16. (*Talega*, *supra*, 225 Cal.App.4th at p. 728.)

In rejecting the developer board members' argument their act of voting at board meetings in connection with the trails constituted protected activity, the *Talega* court noted voting could be, but was not, "per se protected activity." (*Talega*, *supra*, 225 Cal.App.4th at p. 729.) The court concluded the mere fact the developer board members had voted did not implicate the protections afforded by section 425.16 because the claims of the homeowners association arose from the "act of spending money in violation of the [d]eveloper [b]oard [m]embers' fiduciary duties. The allegations in the complaint concerning the breach of fiduciary duty cause of action, for example, include no mention of voting. While the expenditure of money may have been precipitated by a vote, . . . [t]he vote was *merely incidental*." (*Id.* at pp. 729-730, italics added.)

The *Talega* court found the issue of whether the fraud cause of action was subject to the anti-SLAPP statute to be a "closer question." (*Talega*, *supra*, 225 Cal.App.4th at p. 730.) Nonetheless, and, as relevant here, it ultimately determined the issue of who was going to pay for repairing the trails was not an issue of public interest within the meaning of subdivision (e)(3) of section 425.16 because that issue was not subject to any

19

"controversy, dispute, or discussion" when the developer board members in 2005 represented that the homeowners association was responsible to pay the costs of repair. (*Id.* at p. 734.)

In contrast, the *Talega* court noted there had been an "ongoing controversy" in this court's decision in *Damon*, inasmuch as the alleged defamatory statements in *Damon* " 'concerned . . . the decision whether to continue to be self-governed or to switch to a professional management company' " (*Talega*, *supra*, 225 Cal.App.4th at p. 735) and the general manager's " 'competency' " to manage the association (*ibid.*). The *Talega* court further noted the residents of the homeowners association in *Damon* were " 'split into two camps' " on these issues. (*Ibid.*)

*Talega* is factually and legally distinguishable from the instant case. As we discuss *post*, we conclude it is significant that plaintiffs—and not FVHOA—brought this action against director defendants, which is quite unlike the facts of *Talega* in which the complaint against the developer board members was brought *by the homeowners association*. Moreover, *Talega* involved allegations that the three developer board members were appointed to the newly created board of the homeowners association to represent the *developer's* interests. Here, in contrast, director defendants were each *volunteers* and, with the exception of Nielsen (who was appointed), were duly elected to serve on the FVHOA board for three-year staggered terms. In addition, director defendants were each FVHOA members *and* residents of Friars Village; as such, and unlike the developer board members in *Talega*, director defendants presumably were representing the interests of the community when serving on the board.

20

Further, the acts complained of by plaintiffs in the instant case involved director defendants' decisionmaking on "public issues" (i.e., the roofing project and the ARK LLC management contract) that *divided* the board, as clearly indicated by the instant lawsuit. In contrast, the complaint in *Talega* involved allegations the three developer board members in 2005 withheld information on what was then a *noncontroversial* issue pending before the board of the homeowners association regarding the party responsible for repair of the damaged trails. (*Talega*, *supra*, 225 Cal.App.4th at p. 727.)

Finally, and perhaps most importantly, although the three developer board members in *Talega* argued that their votes to expend money to repair the trails constituted protected activity within the meaning of the anti-SLAPP statute, the *Talega* court found this vote was "merely incidental" to the gravamen of the complaint, which concerned their violation of fiduciary duties. (See *Talega*, *supra*, 225 Cal.App.4th at p. 730.)

Unlike the facts of *Talega*, here it is clear from the substance of plaintiffs' declaratory relief claim that director defendants' acts in voting were not "merely incidental" to the allegations of "wrongful conduct" asserted against the "majority block." To the contrary, plaintiffs allege director defendants engaged in such "wrongful conduct" as a result of *how* they voted in board meetings on "public issues" affecting FVHOA members. (See *Navellier v. Sletten* (2002) 29 Cal.4th 82, 92 [noting the "anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted lability—and whether that activity constitutes protected speech or petitioning" (italics added)].) As such, for this separate reason we conclude *Talega* provides no guidance in our case.

21

Conversely, we conclude the case of *Schwarzburd v. Kensington Police Protection & Community Services District Board* (2014) 225 Cal.App.4th 1345 (*Schwarzburd*) informs our decision in the instant case. In *Schwarzburd*, a local board as well as three individual board members were named as respondents in a writ petition brought by two other board members challenging the salary of, and a merit bonus awarded to, a police chief. (*Id.* at pp. 1348-1349.) The *Schwarzburd* court followed the case of *San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Association* (2004) 125 Cal.App.4th 343 (*San Ramon*) in concluding that the petition did not arise from protected activity insofar as it targeted the board as an entity. (*Schwarzburd*, at p. 1353.)

However, as particularly relevant here, the *Schwarzburd* court also concluded that the three individual board members who voted in favor of the salary increase and merit bonus were protected by subdivision (e)(2) of section 425.16.[9] (*Schwarzburd*, *supra*, 225 Cal.App.4th at pp. 1354-1355.) In so concluding, the court noted that the three individual board members were sued by the two other members for allegedly violating board policy by "voting in a manner inconsistent" with that policy (*id.* at p. 1355), and that the three board members "were not sued simply because they voted, but based on *how* they voted and expressed themselves at the [b]oard meeting" (*ibid.*). As a result, the *Schwarzburd* court declined to follow *Donovan v. Dan Murphy Foundation* (2012) 204 Cal.App.4th

_____

[9]    Subdivision (e)(2) of section 425.16 provides "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" constitutes an " 'act in furtherance of a person's right of petition or free speech.' "

22

1500 (*Donovan*)—on which plaintiffs herein also rely, which held " '[t]he mere act of voting . . . is insufficient to demonstrate that conduct challenged in a cause of action arose from protected activity.' " (*Schwarzburd*, at p. 1355, quoting *Donovan*, at pp. 1506-1507.)

In focusing on whether the conduct of the three board members implicated section 425.16, the court in *Schwarzburd* noted that when the trial court questioned legal counsel of the two board members regarding "why they had sued the three individuals when they could get the relief they were looking for by just suing the [d]istrict, petitioners' attorney responded, 'Those three individuals violated the procedures and the rules.' He also admitted: 'I don't think there's any additional advantage there, any strategic advantage.' Petitioners have not alerted us to any additional justifications for the decision to sue the three individual Board members [footnote omitted]. Thus, while they could have sued the [d]istrict directly to challenge the validity of [the chief of police's] contract, they elected not to do so, lending support to defendants' assertion that petitioners' motivation in filing this lawsuit was, at least in part, to intrude upon the First Amendment rights of the individual [b]oard members. *This is the kind of conduct section 425.16 was intended to discourage* [footnote omitted]." (*Schwarzburd*, *supra*, 225 Cal.App.4th at p. 1352, fns. omitted & italics added.)

Just recently, our high court in *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409 (*Vasquez*) cited *Schwarzburd* approvingly when it concluded that votes cast in favor of a hauling contract by three former councilmembers and a former city administrator were

23

protected activity under section 425.16.[10]  The *Vasquez* court noted *Schwarzburd* was "consistent with [its] reasoning that votes taken after a public hearing qualify as acts *in furtherance* of constitutionally protected activity.  And *Schwarzburd*, like this case, demonstrates that elected officials may assert the protection of section 425.16 when sued over how they voted without chilling citizens' exercise of their right to challenge government action by suing the public entity itself."  (*Vasquez*, at p. 427.)

Relying on *Vasquez*, *Schwarzburd* and *San Ramon* as guidance, we conclude director defendants' voting at board meetings on both the roofing project, including the "next phase" of that project, and on the ARK LLC management contract, were acts in furtherance of their right to free speech made in connection with a "public issue" and, thus, were protected under subdivision (e)(3) of section 425.16.[11]

---

10    We sought and received, and have considered in connection with our decision, supplemental briefing from the parties regarding the impact, if any, of *Vasquez* and of another recent California Supreme Court case, *Baral v. Schnitt* (2016) 1 Cal.5th 376, on the issue(s) in the instant case.

11    We recognize *Vasquez* relied on subdivision (e)(1) ["any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law"] and (e)(2) of section 425.16—and *Schwarzburd* on subdivision (e)(2) of this statute, in concluding the individual defendants' acts of voting during official board meetings involved protected activity within the meaning of the anti-SLAPP statute.  In light of our conclusion *ante* that the acts herein complained of occurred in a "public forum" in connection with a "public issue" within the meaning of subdivision (e)(3) of this statute, we conclude this is a distinction without a difference. We further note *Schwarzburd* also relied on subdivision (e)(4) of this statute—the catch-all provision—in concluding the individual board members' votes involved protected activity.  (See *Schwarzburd*, *supra*, 225 Cal.App.4th at p. 1354; see also *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 164 [noting subdivision (e)(4) of section 425.16 "provides a catch-all for 'any other *conduct* in furtherance of the exercise' " of petition or free speech " 'in connection with a public issue or an issue of

In fact, the instant case—when considered in light of *Schwarzburd*[12]—provides an even more compelling example of why an individual board member's vote on a "public issue" implicates his or her right to free speech under section 425.16: unlike *Schwarzburd*, where the "local board" or entity was at least named as a defendant in the action, here plaintiffs purposely omitted the entity itself—FVHOA—from their lawsuit. Plaintiffs' tactical decision to omit FVHOA from their action, when clearly the relief they seek involves FVHOA, its board and their governance of the Friars Village community, further supports our conclusion that director defendants' were sued for exercising their First Amendment rights as a result of *how* they voted on subject matters pending before the board. (See *Schwarzburd*, *supra*, 225 Cal.App.4th at p. 1352.)

C. *Probability of Success on the Merits*

Because we conclude director defendants made a prima facie showing that the gravamen of plaintiffs' complaint arose from protected activity within the meaning of the anti-SLAPP statute, the burden then shifted to plaintiffs to proffer sufficient evidence to demonstrate a probability of prevailing on their claim. (See § 425.16, subd. (b)(1); see also *Kleveland*, *supra*, 215 Cal.App.4th at p. 548.) Although, as noted, the trial court never reached this issue, we do under an independent standard of review. (See

---

public interest' "].) Because we conclude the allegations in plaintiffs' complaint triggered subdivision (e)(3) of section 425.16, we need not decide whether those same allegations also triggered subdivision (e)(4) of this statute.

[12] In *Vasquez*, the public entity itself—the City of Montebello—filed the action against its former councilmembers and former city administrator.

*Schwarzburd*, *supra*, 225 Cal.App.4th at p. 1355; see also *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 615-616.)

In satisfying their burden in step two of the anti-SLAPP analysis, plaintiffs may not merely rely on the allegations in their complaint (see *Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39, 45 (*Nagel*)) or evidence that would not be admissible at trial (see *Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1346).

To qualify for declaratory relief under section 1060,[13] plaintiffs were required to show their action (as refined on appeal) presented two essential elements: "(1) a proper subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating to the rights or obligations of a party." (*Brownfield v. Daniel Freeman Marina Hospital* (1989) 208 Cal.App.3d 405, 410 (*Brownfield*).) "The 'actual controversy' language in . . . section 1060 encompasses a probable future controversy relating to the legal rights and duties of the parties." (*Environmental Defense Project of Sierra County v. County of Sierra* (2008) 158 Cal.App.4th 877, 885.) It does not embrace controversies that are "conjectural, anticipated to occur in the future, or an attempt to obtain an advisory opinion from the court." (*Brownfield*, at p. 410.)

"While section 1060's language 'appears to allow for an extremely broad scope of an action for declaratory relief' [citation], 'an actual controversy that is currently active is

_____

13　Section 1060 provides in relevant part: "Any person interested under a written instrument, excluding a will or a trust, or under a contract, or who desires a declaration of his or her rights or duties with respect to another . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action . . . in the superior court for a declaration of his or her rights and duties."

26

required for such relief to be issued and both standing and ripeness are appropriate criteria in that determination. [Citation.]' [Citation.] 'One cannot analyze requested declaratory relief without evaluating the nature of the rights and duties that the plaintiff is asserting, which must follow some recognized or cognizable legal theories that are related to subjects and requests for relief that are properly before the court.' " (*D. Cummins Corp. v. United States Fidelity & Guaranty Co.* (2016) 246 Cal.App.4th 1484, 1489.)

" 'Whether a claim presents an "actual controversy" within the meaning of . . . section 1060 is a question of law that we review de novo.' " (*American Meat Institute v. Leeman* (2009) 180 Cal.App.4th 728, 741.) The same standard of review applies when we determine whether a matter is ripe for adjudication. (*Farm Sanctuary, Inc. v. Department of Food & Agriculture* (1998) 63 Cal.App.4th 495, 501, fn. 5.) "To determine whether an issue is ripe for review, we evaluate two questions: the fitness of the issue for judicial decision and the hardship that may result from withholding court consideration." (*Security National Guaranty, Inc. v. California Coastal Com.* (2008) 159 Cal.App.4th 402, 418 (*Security National*).)

Turning first to whether there was an "actual controversy" concerning the taking of verbatim notes of board meetings by the board secretary, we conclude plaintiffs cannot show a probability of prevailing on this claim. Although plaintiffs contend the board secretary allegedly had the right to take such notes verbatim, ostensibly because plaintiff Lee was a "certified court reporter," plaintiffs neither direct us to any language in the March 2014 contract, nor to any provision in the two pages of the (incomplete) multi-

27

paginated amended bylaws of FVHOA they lodged in opposition to the anti-SLAPP motion, nor to any other evidence in the record showing the secretary was required to, or even had the discretion to, record verbatim the board minutes.

What's more, the March 2014 contract, which was renewed by majority vote of the board in February 2015, further provided ARK LLC's agents were required to "type minutes, and [to] take or record such minutes in accordance with best business practices of regular meetings of the [b]oard of [d]irectors" and to "transcribe and provide them to the [b]oard of [d]irectors in [d]raft form."

Thus, other than the bare-bones allegations in their complaint, which alone are insufficient to satisfy their burden under step two of the anti-SLAPP statute (see *Nagel*, *supra*, 109 Cal.App.4th at p. 45), plaintiffs proffered no evidence showing there is an "actual controversy" between the parties concerning the taking of verbatim notes of board meetings by the board secretary.[14]  As such, plaintiffs cannot show a probability of prevailing on this particular claim.

Nor can plaintiffs show a probability of prevailing on their roofing project claim. The record shows the board obtained more than three bids before it voted in May 2013 to retain RE as the contractor for that project.  What's more, the record shows that only a few *months* later, the board again voted to undertake the "next phase" of that *same*

_____

[14]    In light of our decision on this claim, we need not decide whether typing verbatim the minutes of board meetings was an issue that was fit "for judicial decision" or whether plaintiffs would suffer "hardship" if we withheld our consideration on this issue, which, candidly, appears to be relatively trivial.  (See *Security National*, *supra*, 159 Cal.App.4th at p. 418.)

project; that RE agreed to do the work on the "next phase" of this project under the *same* terms voted on by the board when it initially approved the project; and that in both votes, there was only one board member who voted against the project, and it is not even clear the one dissenting vote was a named plaintiff in this case.

In addition, the record shows neither Birleanu nor Nielsen was on the board when it—as opposed to the "majority block"—voted during the May and September 2013 meetings to approve and extend, respectively, the roofing project. Clearly, plaintiffs cannot prevail on their claim that the "majority block" violated board rules concerning the bidding of the roofing project when two members of that "block" were not even on the board.[15]

For these reasons, we independently conclude plaintiffs cannot show that there is an "actual controversy" on their claim the "majority block" allegedly failed to obtain the necessary bids in connection with the roofing project. Plaintiffs therefore cannot satisfy their burden under step two of the anti-SLAPP statute with respect to this particular claim. (See § 425.16, subd. (b)(1).)

This leaves the ARK LLC management contract. As noted, the board in March 2014 voted to approve that contract. Plaintiffs do not complain the 2014 vote was made in violation of any rule or board policy, including, for example, without the requisite number of bids allegedly required for such contracts. Rather, plaintiffs only complain

---

15    Of course, if plaintiffs had merely named FVHOA as a defendant in their complaint, as opposed to the individual director defendants who served as volunteers on the FVHOA board, this would never have been an issue.

about the vote of the "majority block" in February 2015, when the board voted six to three to *renew* (under the "automatic renewal" provision) the March 2014 contract for another year.

Although plaintiffs' complaint alleges there were "material changes" in the terms of the renewed March 2014 contract, they proffered no evidence whatsoever to support this allegation. (See *Nagel*, *supra*, 109 Cal.App.4th at p. 45.) As such, and because plaintiffs do not contend the board—as opposed to the "majority block"—failed to obtain the alleged necessary bids when it *initially* approved the March 2014 contract, we independently conclude plaintiffs cannot show an "actual controversy" exists and, thus, satisfy their burden under step two of the anti-SLAPP statute in connection with this claim. (See § 425.16, subd. (b)(1).)

Lastly, as noted *ante*, several of the subject matters in which plaintiffs requested a judicial declaration appear to involve controversies that were "conjectural," "anticipated to occur in the future," or would result in an "advisory opinion" from the court,[16] including: number 1 ["at least three bids are required before the FVHOA can award contracts in material amounts"]; number 5 ["contractors doing business with the FVHOA . . . should be free of conflicts of interests"]; number 6 ["FVHOA should not enter into contracts based upon former employees using confidential information]; number 7 [the FVHOA board "should not disclose confidential information of the FVHOA" with the manager defendants]; and number 9 [manager defendants and FVHOA should "not be

---

[16]    See footnote 8, *ante*.

30

permitted to retaliate against [FVHOA] members for their lawful public participation or questions of their [b]oard"]. (See *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170–171 [ripeness doctrine generally prevents courts from issuing purely advisory opinions on matters before the controversy between the parties has become sufficiently " 'definite and concrete' "]; see also *Brownfield*, 208 Cal.App.3d at p. 410.)

In addition, it appears at least one of the nine subject matters in plaintiffs' request for judicial declaration involved *past* wrongdoing of one or more members of the "majority block" that cannot be the basis of a judicial declaration: number 8 ["the FVHOA treasurer [i.e., McDonald] should not be retaliated against by the [m]ajority [b]lock . . . because he raised legitimate concerns about the FVHOA reserve deficiency, and raised ways of reducing FVHOA costs"].[17] (See *Canova v. Trustees of Imperial Irrigation Dist. Employee Pension Plan* (2007) 150 Cal.App.4th 1487, 1497 [recognizing the often-cited rule that declaratory relief "operates prospectively to declare future rights, rather than to redress past wrongs"].)[18]

---

[17] The complaint specifically alleged that Silveira retaliated against McDonald after McDonald joined the board in November 2014 and became its treasurer; that Silveira asked McDonald to resign as treasurer (but not from the board) in 2015 because he had questioned the amount of reserve funding of FVHOA and had repeatedly urged the board to exercise cost restraint in connection with its contracts for landscape maintenance, pest control and the management of Friars Village; and that when McDonald sought clarification regarding why he was being asked to resign as treasurer, Silveira was unable or refused to give any specific reason.

[18] In light of the basis of our decision in this case concerning step two of the anti-SLAPP statute, which did *not* involve a defense plaintiffs claim was improperly raised by

31

DISPOSITION

The trial court's order denying director defendants' anti-SLAPP motion to strike plaintiffs' declaratory relief claim is reversed.  On remand, the trial court is directed to grant the anti-SLAPP motion with respect to each director defendant.  Director defendants to recover their costs of appeal.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.

director defendants on appeal, we deem plaintiffs' unopposed request for judicial notice moot.

Filed 12/8/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| NANCY ANN LEE et al., | D068835 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-215-00009400-CU-MC-CTL) |
| SIL SILVEIRA et al., | |
| Defendants and Appellants. | |

THE COURT

The opinion in this case filed December 5, 2016 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to California Rules of Court, rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to: All parties