Filed 8/19/25  Leahy v. Cameron CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| ROBERT LEAHY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSHUA CAMERON,<br><br>    Defendant and Appellant. | D083623<br><br><br><br>(Super. Ct. No.<br>37-2021-00006529-CU-MC-NC) |

APPEAL from an order of the Superior Court of San Diego County, Blaine K. Bowman, Judge.  Affirmed.

Eric Marquez for Defendant and Appellant.

G10 Law and Daniel T. Watts for Plaintiff and Respondent.

California's "anti-SLAPP[1] statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884 (*Wilson*).) "To that end, the statute authorizes a special motion to strike claims 'arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.'" (*Id.* at p. 884, quoting Code Civ. Proc.,[2] § 425.16, subd. (b)(1).) Anti-SLAPP litigation is a two-step process. "'Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged. If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit."' If the plaintiff fails to meet that burden, the court will strike the claim." (*Wilson*, at p. 884, citations omitted.)

In this case, Robert Leahy was serving as the First Vice Chair of the Veterans Caucus of the California Democratic Party (Veterans Caucus or Caucus). At the same time, Joshua Cameron was acting as an advisor to the Caucus's Chair. When Leahy allegedly began acting inappropriately, several Executive Board members and a few other Caucus members, including Cameron, decided to remove Leahy from the board and the Caucus altogether.

Faced with the prospect of being ousted, Leahy instead resigned from his board position. He then sued more than a dozen individuals involved

---

[1] "SLAPP" stands for "strategic lawsuit against public participation." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 381, fn. 1 (*Baral*).)

[2] Further statutory references are to the Code of Civil Procedure.

with the Veterans Caucus who allegedly spread false information about him and/or made the decision to remove him. Cameron responded by filing a special motion to strike the complaint "as it pertained to him" under the anti-SLAPP law.

The trial court ultimately denied the motion, finding that Cameron failed to sufficiently identify what claims he sought to strike or demonstrate how the communications between Caucus members implicated an issue of public interest within the meaning of the anti-SLAPP statute. For reasons we explain, we agree with the trial court that Cameron failed to carry his burden of showing that Leahy's claims against him arose from protected activity. Accordingly, we affirm the order denying the special motion to strike.

## FACTUAL AND PROCEDURAL BACKGROUND

The Veterans Caucus is a statewide organization within the California Democratic Party (CDP). The purpose of a caucus, generally, is to participate in the policy decisions of the CDP—for example, by proposing legislation to the party—and to encourage its community members to become interested in and involved with the CDP.

According to its bylaws, the Caucus was created "to protect veterans['] benefits and promote values of the [CDP], identify, discuss and address veterans issues, accurately represent the needs of all veterans, and to elect Democratic candidates who support the issues critical to veterans in all areas and at all levels of government." Its mission is "to work within and through the [CDP], providing a strong voice and representation within the party structure; and promoting the welfare of veterans both through effective legislation and encouraging veterans to participate fully at all levels of

3

policy making and public service." It supports candidates who support veterans, and opposes those who do not.

Leahy joined the Veterans Caucus around June 2016. A few years later, in June 2019, his fellow Caucus members elected him to serve as First Vice Chair on the organization's Executive Board. The duties of the First Vice Chair include managing the Caucus's agenda and calendar; supervising the outreach and development of the Caucus; participating in Caucus committees; assisting the Chair as needed; and assuming the Chair's responsibilities if they are absent from a regular meeting or other function at which their attendance is required. Around the time Leahy became First Vice Chair, Cameron became an advisor to the Chair regarding "parliamentary matters."

Soon thereafter, Leahy petitioned the Veterans Caucus's Special Committee for Review to discipline the Chair and the Treasurer because they allegedly failed to provide the CDP with an updated roster of Caucus leadership, misplaced the personal information of several members, and lost certain funds. When Leahy concluded the Special Committee for Review did not act swiftly enough, he escalated his petition to the CDP's Compliance Review Commission.

According to Leahy, the defendants then "retaliated against him for whistleblowing" by "spreading falsehoods" about him. More specifically, he claims that between September 2019 and March 2020, the defendants—including Cameron—excluded him from meetings and "conspired" to remove him from his First Vice Chair position in e-mails, over the phone, and during meetings.

For instance, Leahy claims that in September 2019 the defendants "circulated a letter through email" that made "false and defamatory

4

statements" about him and his character." The e-mail is marked "for immediate release to membership" and is signed by several defendants, including Cameron. It explains that Leahy had engaged in a course of misconduct that required his "immediate suspension" and "the initiation of actions to permanently remove him from the executive board and the caucus itself." "As caucus members," the e-mail concluded, "you are entitled to know . . . the status of these actions." Below the signature block was a link "to view the full details involving" Leahy.

The link apparently takes the reader to a letter signed by the same defendants. The letter similarly explains that Leahy was "frequently attempt[ing] to exercise power far in excess of his position and causing needless conflict whenever the caucus board attempts to conduct business," which was "damaging the reputation and credibility of the caucus and causing some of its members to feel threatened." The letter sets forth a list of examples of Leahy's misconduct. In this list, Leahy identifies 25 statements that he characterizes as false. These include allegations that he destroyed caucus records; changed the passwords on all files, accounts, and applications used by the board; bullied and threatened other board members by throwing items, screaming, and using profanities; and, during a joint meeting with the Latino Caucus, "interrupt[ed] the Latino Caucus chair and expos[ed] parts of his body to the audience." The letter goes on to assert that Leahy's misconduct was "egregious enough to warrant [his] immediate suspension from the executive board and the initiation of actions to revoke his caucus membership." But because the Caucus was unable to complete these actions itself due to the unavailability of a necessary board member, the signatories were "requesting that the [CDP] endorse this action and take whatever steps are necessary to complete this process."

5

In October 2019, Leahy lodged two additional complaints with the CDP Compliance Review Commission on grounds that the Veterans Caucus was excluding him from meetings and attempting to remove him from the board. The commission eventually determined that the Caucus—however justified it might be in removing Leahy from his position—failed to follow the proper procedures to do so. Leahy nevertheless chose to resign in March 2020.

In June 2023, Leahy filed a First Amended Complaint (FAC) asserting several causes of action against defendants.[3] Those involving Cameron were libel per se (Civ. Code, § 45); slander per se (*id*., § 46); defamation per se (*id*., § 44); "civil conspiracy to commit defamation, libel, slander, fraud and deceit"; and injunctive relief.

In his causes of action for libel, slander, and defamation, Leahy identified several letters and e-mails that allegedly contained one or more false statements. As to each letter or e-mail, Leahy set forth which defendant or defendants authored the communication, and listed every false statement contained therein. The only communication that involved Cameron was the September 2019 e-mail containing 25 false statements described above.[4] In the conspiracy action, Leahy alleged that all of the defendants conspired to commit defamation, libel, slander, deception, and fraud as "demonstrated through their own emails, falsified minutes, letters of false information and

---

[3]    The named defendants include everyone who signed the September 2019 letter, plus several additional Caucus members.

[4]    The slander and defamation actions alleged that "each and every" defendant sent a letter containing defamatory statements on August 31, 2019, but the libel action n did not allege that Cameron was involved in sending that letter. The letter, attached to the FAC as an exhibit, shows that Cameron was *not* a signatory. On appeal, Cameron maintains that the allegations concerning the August letter do not involve him.

6

defamatory statements of and concerning [Leahy], their planning and execution of deliberate abuse of power, violating the bylaws and illegally removing [Leahy] from his position without due process and continuing to harass him." Finally, in his action for injunctive relief, Leahy asked the court to order the defendants to resign from their leadership positions in the Veterans Caucus.

In August 2023, Cameron filed a special motion to strike the FAC "as it pertain[ed] to [him]" under the anti-SLAPP statute. (§ 425.16.) In the "Statement of Fact" section of his memorandum of points and authorities, Cameron observed that some of the allegations in Leahy's complaint were against all of the defendants, but others were not. Cameron identified the allegations specific to him, with citations to the FAC, as follows: (1) he "entered into a civil conspiracy with other co-defendants between September 19, 2019, and March 2020 to deprive Leahy of his position as 1st Vice Chair of the Caucus"; (2) "[t]he civil conspiracy was coordinated by Cameron and co-defendants via meetings, emails, and phone calls"; (3) "Cameron and co-defendants created a false website for the Caucus containing false minutes of meetings"; and (4) "on or about September 29, 2019, Cameron and co-defendants published an email to members of the Caucus containing false and defamatory statements against him."

As to the first step of the anti-SLAPP analysis, Cameron contended that Leahy "complains of things done in furtherance of [his] free speech rights in connection with a public issue." To that point, he argued that because the Veterans Caucus is part of the CDP, which is the largest and most powerful political party in California, Caucus leadership "is a matter of public significance." Accordingly, because "Leahy's claims against Cameron, civil conspiracy and defamation, all revolve around" removing Leahy from his

First Vice Chair position within the caucus, the complained-of activities warranted anti-SLAPP protection.

Regarding the second step of the analysis, Cameron contended that "[s]ince the only tortious act Leahy alleges Cameron participated in was the September 2019 email, Leahy must make a *prima facie* showing that the email was defamatory for both his civil conspiracy claim and his defamation claim." Leahy could not make this showing, Cameron asserted, because the e-mail was privileged under Civil Code section 47, subdivision (c). Moreover, Leahy was a limited purpose public figure—having involved himself in veterans' issues and Democratic Party politics—and he could not show the statements in the e-mail were false or made with actual malice. Cameron lastly pointed out that Leahy could not demonstrate he was entitled to special damages because serving as the First Vice Chair of the Caucus is an unpaid, volunteer position.

In support of his contention that Leahy was a limited purpose public figure, Cameron submitted evidence of a few instances where Leahy spoke publicly about veterans' issues. Once, he wrote a letter and made comments to the Pico Rivera City Council rebuking disparaging remarks that a city council member made about veterans. In another instance, he appeared in an online video about deported veterans. He also circulated a pledge to some congressional candidates seeking their support for deported veterans. Finally, he once campaigned to be a delegate to the CDP Convention.

In response, Leahy contended as to the first step that Cameron failed to demonstrate the challenged causes of action—which Leahy understood were the civil conspiracy, defamation, libel, and slander actions—arose from protected activity. In his view, the claims were based on an *illegal* agreement to defame him and remove him from his leadership position, and *false*

8

statements that harmed his reputation, which are not protected activities under the anti-SLAPP statute. Leahy also disagreed that his allegations against Cameron concerned any issue of public interest. Leahy considers himself a private person who confines his activities to "limited leadership roles" within small, private groups of "limited power," such as the Veterans Caucus. And although "the Veterans Caucus engages in public affairs in a limited capacity through the Democratic Party, the specific statements alleged concern only the personal dynamics between private individuals related to internal caucus leadership."

As to the second step, Leahy insisted he established a probability of prevailing on the merits based on the "detailed allegations" of Cameron's "participation in a conspiracy to defame [him] and improperly remove [him] from his position" with the Veterans Caucus as well as the "alleged specific instances of defamatory statements" Cameron made in the September 29, 2019 e-mail. The alleged defamatory statements were not privileged because they were made to the general public.[5]

In support of his opposition, Leahy submitted a declaration in which he acknowledged the various times he spoke about veterans' issues, as Cameron catalogued, but insisted these activities were insufficient to make him a public figure. He also averred that the issue of whether he should be removed from his board position was not publicly debated. The discussion was limited to the board and a few other Caucus members.

---

[5]    After Cameron pointed out in his anti-SLAPP motion that Leahy's FAC was not verified, Leahy submitted an errata seeking to add, "I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct" to the final page of his FAC.

Following a hearing, the trial court denied the anti-SLAPP motion. Relying on *Baral*, *supra*, 1 Cal.5th 375, the court determined that Cameron failed "to demonstrate *which* of the 192 paragraphs (not to mention which of their sub-paragraphs)" in the FAC were "subject to the protections of the anti-SLAPP statute."

Even assuming Cameron met that burden, the trial court concluded he also failed to show "that communications between members of the Veteran's Caucus within the larger [CDP] warrant special protection against liability for defamation because the communications here about . . . Leahy do not involve a person or entity that is 'in the public eye,' do not directly affect a large number of people beyond the direct participants, and, being largely about the actions of one man and his connection to the inner workings of the Veteran's Caucus, are not about matters of widespread, public interest." The court lastly noted there did "not appear to be a 'functional relationship' between the challenged activity (the circulating of letters about [Leahy]) and discussion of a public issue (such as veteran's [*sic*] rights)."

## DISCUSSION

Cameron maintains the trial court wrongly denied his anti-SLAPP motion. As to the initial part of the court's reasoning, Cameron argues his motion made sufficiently clear that he sought to strike the civil conspiracy, libel, slander, and defamation claims, all of which rested on the publication of the September 2019 e-mail that he signed onto.

In response, Leahy posits that Cameron's motion sought to strike the entire FAC, not particular claims or causes of action. In taking this "all-or-nothing approach," Cameron had the burden to show the entire complaint arose from protected activity yet, as he concedes, at least some of the claims in the FAC did not involve protected conduct. Leahy contends that Cameron

10

should have precisely identified (i.e., quoted) each defamatory statement in the FAC that was allegedly protected. It was not enough to point to "four (invented) general categories of claims, and characterizing them as the 'allegations' that he seeks to strike."

As is often the case, the proper analysis lies somewhere in the middle. In *Baral*, *supra*, 1 Cal.5th 376, the Supreme Court summarized each party's burden in anti-SLAPP litigation: "At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them. When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at this stage. If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached. There, the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken." (*Id*. at p. 396.) We consider de novo whether Leahy's claims arise from protected activity. (*Wilson*, *supra*, 7 Cal.5th at p. 884.)

Here, Leahy's characterization of Cameron's anti-SLAPP motion as an all-or-nothing attack on the FAC is belied by the record. To be sure, the notice of motion broadly states that Cameron was making a "special motion to strike [Leahy's] Complaint" under section 425.16. The very first sentence of the motion, however, clarified that he was seeking to strike the complaint "*as it pertains to Defendant Cameron*" under the statute. (Italics added.) The memorandum of points and authorities goes on to say that "Leahy makes

11

many specific allegations in his Complaint against all Defendants and not all allegations are applicable to all Defendants." Then, in arguing why Leahy's claims against him lacked minimal merit, Cameron specifically discussed the civil conspiracy, defamation, slander, and libel actions. The motion concludes by asking the trial court to strike "all of the claims against Cameron" from the complaint.

Thus, although the notice of motion suggests Cameron sought to strike the entire FAC, the motion and supporting argument make clear he was only targeting certain causes of action involving him.[6] Indeed, Leahy's opposition to the motion reflects his understanding of its limited scope. (See *Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268, 1277 ["The purpose of the notice requirements 'is to cause the moving party to "sufficiently define the issues for the information and attention of the adverse party and the court" ' " and "[s]ometimes this purpose is met notwithstanding deficient notice"]; see also *Miszkewycz v. County of Placer* (2024) 99 Cal.App.5th 67, 73–76 [Cal. Rules of Court, rule 3.1322—which generally requires a notice of motion to strike to quote the material to be stricken—does not apply to anti-SLAPP motions].) We reject Leahy's attempt to change his tune on appeal.

At the same time, Cameron's motion to strike is no model of clarity. It was his burden to identify all allegations of protected activity and the claims for relief supported by them. (*Baral, supra*, 1 Cal.5th at p. 396; accord, *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 ["The defendant's burden is to identify what acts each challenged claim rests on and to show how those acts are protected under a statutorily defined category of protected

---

6      Cameron clarifies on appeal that the cause of action for injunctive relief was never subject to his anti-SLAPP motion.

12

activity"].)  Cameron maintains he identified the relevant allegations of protected activity in the "Statement of Fact" section of his motion, where he lists four activities he allegedly engaged in, with citations to the FAC: (1) conspiring with other co-defendants between September 2019 and March 2020 to deprive Leahy of his position; (2) coordinating the conspiracy via meetings, e-mails, and phone calls; (3) creating a false website for the Caucus to post false meeting minutes; and (4) publishing the September 2019 e-mail containing false and defamatory statements to Caucus members.  But in the "Step One" section of his analysis, he does not explain how each activity supplies one or more elements of the challenged causes of action.  (See *Bonni*, at pp. 1015–1016.)  In fact, on appeal, he concedes that the first three activities do not support any claim against him.

Nor did Cameron clearly explain how each activity was protected within the meaning of the anti-SLAPP statute.  Instead, in his Step One analysis, he collectively asserted that his "activity, as alleged by Leahy, centered around removing Leahy from his leadership position."  This activity was protected, Cameron claimed, because it implicated a public issue— namely, leadership within the CDP, the largest and most powerful political party in the state. Cameron contended there was "an ongoing controversy and dispute over leadership" in the Veterans Caucus, such that protecting his activity "would encourage participation in matters of public significance, not just in veteran's [*sic*] affairs, but in all matters that a California political party would be interested in."

In his Step Two analysis, however, Cameron more closely articulates the argument he advances on appeal—that the civil conspiracy, defamation, slander, and libel actions all depend on the publication of the September 2019 e-mail.  As he reasoned, the civil conspiracy action required an agreement to

13

commit a tortious act, and the only tortious act he allegedly participated in was defaming Leahy. Defamation, in turn, is committed by slander or libel. Since there were no allegations of oral statements, Leahy must be relying on a theory of libel, under which he must show " 'a publication that is false, defamatory, unprivileged, and has a tendency to injure or cause special damage.' " And the only publication that Cameron was allegedly involved in was the September 2019 e-mail.

Perhaps the pieces of Cameron's current argument were included in his anti-SLAPP motion, but he failed to put them together into a coherent Step One analysis. In any event, even accepting the premise that the challenged actions arose from the publication of the September 2019 e-mail, we disagree with Cameron that such conduct qualifies for anti-SLAPP protection.

On this point, Cameron invokes the so-called catchall provision of section 425.16, which broadly protects "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) To determine whether conduct falls within this provision, we employ a two-part analysis. (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149 (*FilmOn*).) First, we ask what " 'public issue' " or " 'issue of public interest' " the challenged speech or conduct implicates—"a question we answer by looking to the content of the speech." (*Ibid*.) A public issue may be implicated where the speech or conduct (1) concerns a person or entity in the public eye; (2) could directly affect a large number of people beyond the direct participants; or (3) involves a topic of widespread, public interest. (*Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924 (*Rivero*).) Whether the challenged activity implicates a public issue is an objective inquiry. (*Geiser v. Kuhns* (2022) 13

14

Cal.5th 1238, 1254 (*Geiser*).) While "the movant's beliefs, motivations, or characterizations may be relevant" they are not "dispositive and, if objectively unreasonable, will not carry weight." (*Ibid.*)

"Second, we ask what functional relationship exists between" the challenged activity "and the public conversation about some matter of public interest." (*FilmOn*, *supra*, 7 Cal.5th at pp. 149–150.) There must be " 'some degree of closeness' " between the activity and the asserted public interest. (*Id*. at p. 150.) It is not enough to " 'refer to a subject of widespread public interest.' " (*Ibid.*) "Defendants cannot merely offer a 'synecdoche theory' of public interest, defining their narrow dispute by its slight reference to the broader public issue." (*Id*. at p. 152.) Rather, the speech or conduct at issue must itself contribute to or further the public conversation on an issue of public interest. (*Id*. at pp. 150–151, 154.) In conducting these inquiries, context—such as the identity of the speaker or participants, the audience, and the purpose and timing of the speech or conduct at issue—is important to consider. (*Id*. at pp. 140, 150; *Geiser*, *supra*, 13 Cal.5th at pp. 1252–1253.)

Here, it is undisputed that the September 2019 e-mail did not concern a *person* in the public eye—Leahy is a private individual—or directly affect a large number of people beyond the direct participants. But Cameron maintains the e-mail concerned an *entity* in the public eye—the CDP—and a topic of widespread public interest—CDP leadership. On the latter point, Leahy asserts that the allegations in the e-mail—including that he exposed "parts of his body" during a meeting, used profanity, and threw an item at another board member—were not of public interest and did not contribute to any public debate. Rather, they were "parochial concerns, gripes arising out of the defendants' personal distaste for [him] and their desire to see [him] ostracized from" the Caucus.

15

As briefly described above, the September 2019 e-mail, marked "for immediate release to membership,"[7] begins by explaining that a "situation has developed regarding the executive board that unfortunately requires the immediate suspension of one of the board members and the initiation of actions to permanently remove him from the executive board and the caucus itself." The e-mail goes on to specify that Leahy was deliberately interfering with the Caucus's ability to conduct business by destroying records, using Caucus resources for personal use, bullying and threatening other board members, and the like. "After careful consideration," the e-mail's signatories had determined that Leahy's actions were "egregious enough" to warrant his suspension and removal. The signatories believed the Caucus members "were entitled to know . . . the status of these actions." The e-mail is signed by 12 board members and general members, including Cameron.

Below the signature block is a "link to view the full details involving" Leahy. The link apparently takes the reader to a letter from the same 12 individuals to the CDP. The letter states "[t]here are conflicts among members of the executive board of the Veterans Caucus of the [CDP] that prevent the board from conducting business and that are damaging the reputation and credibility of the caucus and causing some of its members to feel threatened." More specifically, Leahy was attempting "to exercise power far in excess of his position" and causing "needless conflicts" leading to arguments, anger, and the obstruction of business. The letter then lists 20 examples of Leahy's misconduct. Like the e-mail, it expressed that the

7       In his FAC, Leahy alleges the e-mail was "sent to unknown number of persons with unknown identities" from "an unauthorized and unofficial" Caucus e-mail account. He did not receive the e-mail directly. Cameron does not clarify this point.

16

signatories believed Leahy's behavior warranted his suspension and removal. The board had attempted to carry out those actions according to its regular procedures, but those procedures require the participation of an individual in the "Sergeant-At-Arms" position, and this individual had become unavailable to participate. The signatories were therefore calling upon the CDP to "endorse this action and take whatever steps and necessary to complete this process."

In our view, "a reasonable, objective observer" reading this e-mail and the attached letter would not conclude they concern the leadership of the CDP. (*Geiser, supra*, 13 Cal.5th at p. 1254.) These materials clearly relate to Leahy and his fitness for serving on the executive board of the Veterans Caucus, or otherwise participating in the Caucus as a general member. And while the Caucus is "a constituent part" of the CDP—insofar as it is governed by CDP decisions and cannot take official positions independent of or contrary to the CDP—the organizations have distinct leadership structures. There is no suggestion that by assuming the First Vice Chair position within the Caucus, Leahy became an executive board member, officer, director, or general member of the Democratic State Central Committee (DSCC), the governing body of the CDP.[8] The e-mail and letter do not discuss anyone serving in a DSCC leadership role or any action taken by the CDP. Contrary to Cameron's suggestion, the mere fact that the letter ends with a request for the CDP to "endorse" the decision to suspend and remove Leahy does not transform its contents into a discussion of CDP leadership.

---

[8] The Chair, by contrast, becomes a member of the executive board of the DSCC.

17

More to the point, even assuming the e-mail and letter implicated the public issue of CDP leadership, Cameron fails to demonstrate these materials furthered a specific public conversation on that topic. Indeed, the record is unclear as to who exactly received the e-mail. (See *ante*, at fn. 3.) If it was sent to members of the Veterans Caucus, the e-mail simply informed the members of the signatories' decision to suspend and remove Leahy, and the reasons for that decision; it did not refer to any ongoing discussion among the members on the subject, nor did it invite any input from the members on the decision. (See *Talega Maintenance Corp. v. Standard Pacific Corp.* (2014) 225 Cal.App.4th 722, 734 [absent "any controversy, dispute, or discussion, the issue . . . , which was of interest to only a narrow sliver of society, was not a public issue"]; cf. *Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 116, 118 [by posting on union's website that plaintiff-manager was removed from office for financial mismanagement, defendant was not participating in any union–wide discussion of plaintiff's qualifications, but was simply informing members of the termination].)

The letter, in turn, was ostensibly written to someone at the CDP— again, the record is ambiguous on this point.[9] It similarly informed the reader about Leahy's misconduct and the Caucus's decision to suspend and remove him. Although the letter concludes with a request for the CDP to "endorse" this decision, there is nothing in the record explaining the extent of discussion, if any, that such an endorsement would require. The manifest purpose of the letter was to have a higher authority (the CDP) sanction Leahy's expulsion because the Caucus was unable to do so without its Sergeant-At-Arms. There is no indication that the letter was intended to

---

[9]     The letter does not include any address or salutation.

18

facilitate some widespread, public debate on the matter. (Cf. *FilmOn*, *supra*, 7 Cal.5th at p. 153 [reports did not further conversation on public issue where the "information never entered the public sphere, and the parties never intended it to"].) It is insufficient to point out that Californians are generally interested in democratic leadership. (See *id*. at p. 150 [" '[t]he fact that "a broad and amorphous public interest" can be connected to a specific dispute' is not enough"].)

*Macias v. Hartwell* (1997) 55 Cal.App.4th 669 and *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468 (*Damon*), on which Cameron relies, are distinguishable. In *Macias*, the plaintiff and defendant were running against each other to become president of a union. The defendant issued a campaign flyer that the plaintiff considered defamatory. (*Macias*, at pp. 671–672.) The *Macias* court easily concluded the publication of the flyer involved a public issue: "a union election affecting 10,000 members and [plaintiff's] qualifications to serve as president." (*Id*. at pp. 673–674.)

In *Damon*, the resident-members of a homeowners association became sharply divided over whether to keep or replace the association's general manager. (*Damon*, *supra*, 85 Cal.App.4th at pp. 471–472.) Those in the "replace camp" criticized the manager in articles in a periodical circulated to the residents and local businesses. (*Id*. at p. 472.) Months later, the residents elected new directors to the association's Board of Directors who wanted to replace the manager with a professional management company. (*Ibid*.) Some of the newly elected directors began criticizing the manager during board meetings and in "memoranda." (*Ibid*.) Residents in the "keep camp" then launched an unsuccessful recall election to remove the critical directors. (*Id*. at p. 473.) The manager eventually sued the residents who

19

authored letters or articles in the periodical, the critical directors, and the periodical itself for defamation. (*Ibid*.) The trial court granted an anti-SLAPP motion to strike the complaint, and this court affirmed. (*Id*. at pp. 471, 473.) As relevant here, we held the allegedly defamatory statements concerned public issues within the meaning of section 425.16, subdivision (e)(3) because "they concerned the very manner in which this group of more than 3,000 individuals would be governed—an inherently political question of vital importance to each individual and to the community as a whole"—and "were made in connection with the Board elections and recall campaigns"—a "quintessential" subject of free speech protection. (*Damon*, at p. 479.)

Unlike in *Macias* and *Damon*, there was no scheduled election or plebiscite to suspend or remove Leahy from his First Vice Chair position. Again, the September 2019 e-mail stated that the Caucus members "were entitled to know . . . the status of these actions," but did not solicit any vote or comment from the members. Nor does the letter to the CDP give any indication as to who, if anyone, should participate in the "endorsement" of the decision to suspend and remove Leahy. There is certainly no reason to think the CDP would turn to its members—all registered Democrats in California—to weigh in on the matter. And there is nothing in this case akin to the debates among thousands of members over the union president in *Macias* or the general manager in *Damon*.

For these reasons, we agree with the trial court that Cameron failed to carry his burden of showing Leahy's claims arose from protected activity. Accordingly, we need not decide whether his claims have minimal merit.

## DISPOSITION

The order denying the special motion to strike is affirmed.  Leahy is entitled to costs on appeal.


DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DO, J.